[Civ. No. 23946.   First Dist, Div. Two.   Feb. 27, 1968.]

CHRISTOPHER H. HILL, JR., as Administrator, etc., et al., Plaintiffs, Cross-defendants and Appellants, v. FLORENCE McCRAE ALLAN, Defendant and Respondent; MARGARET A. HUDSON et al., Defendants, Cross-complainants and Appellants; C. EASTON ROTHWELL et al., Cross-defendants and Respondents.

Richard J. Archer, William R. Berkman, John M. Kelly and Morrison, Foerster, Holloway, Clinton & Clark for Plaintiffs, Cross-defendants and Appellants and for Cross-defendants and Respondents.

Ralph W. Thompson, Thompson & Hubbard, Thomson J. Hudson, Boekel, Moran & Power, John M. Thompson and Richard P. Powell for Defendants, Cross-complainants and Appellants.

No appearance for Defendant and Respondent.

TAYLOR, J.—Defendants[1] (hereafter collectively Allans) appeal from a judgment quieting the title of plaintiffs[2] and cross-defendants[3] (hereafter collectively referred to as Nielsons) to a prescriptive easement, enjoining them from interferring with the use thereof, and denying relief on their cross-complaint. The Allans contend error because the Nielsons' contemplated use would unduly burden the servient tenement. On the Nielsons' cross-appeal, the only contention is that the trial court erred in denying them damages for disparagement of title. While we will separately set forth the particular contentions on appeal and the cross-appeal, a summary of the facts, more or less in chronological order, is necessary for an understanding of all the issues presented.

The Allans own an 800-acre tract of land consisting of individual ownerships with coterminous boundaries in Monterey County, south of Carmel-By-The-Sea, directly east of and adjacent to State Highway No. 1 and Point Lobos Reserve State Park. The Nielsons own the 120 acres located uphill to the south and east of the Allan property. The easement in controversy curves irregularly for about a mile and a half along an existing road that runs uphill east of the highway across the Allan properties, as well as other properties in the area. The road has been in existence for over 70 years and has always been the only practical means of access to the individually owned properties of all of the parties.

In the 1890's, the road served a commercial coal mine then located to the east of the Nielson property. The mine and almost all of the property now owned by defendants was acquired by their father, Alexander Allan, Sr., who resided on the property and used the road for his residence and dairy cattle operations. At the end of the century, the coal mining operation had stopped.

In 1912, the 120 acres now owned by the Nielsons was acquired by the MacDonalds by homestead. The MacDonalds'

---

[1]Defendants and appellants are Alexander M. Allan, Jr., his widow, Florence M. Allan, and the Crocker-Citizens National Bank, as trustee and executor of his will, and his sisters, Margaret A. Hudson and Eunice A. Riley.

[2]Plaintiffs and respondents are Virginia Nielson, R. Wesley Wright, Roberta M. Wright, Gurdon S. Pulford, Florence A. Pulford, Vincent E. Klevesahl, Ferrol J. Klevesahl, Cary P. Gray, Edith J. Gray, H. Christen Zweng and Mary Nelson Zweng. While the appeal was pending, Virginia Nielson died and the administrator of her estate, Christopher H. Hill, Jr., was substituted.

[3]C. Easton Rothwell, Virginia Rothwell, Fletcher Dutton and Sallie K. Dutton, are transferees of some of the property of plaintiffs.

use of the road was open, continuous and compatible with the employment of their land as a farm and residence. The other contiguous owners (Norton, on whose property to the east the road ends; and the predecessors of Wright and St. John's College) also used the road in a manner compatible with the dairy and cattle operations in the area. Allan, Sr. and his successors were aware of these open and continuous uses by MacDonalds and the other contiguous owners and never indicated disapproval or took any action. Accordingly, the Mac-Donalds believed they had a right to use the road, independent of any permission from Allan.

From sometime before 1930, two gates existed on the road. The first, hereafter No. 1, was made of wire and located at the dairy on the property now owned by defendant Riley; the second, hereafter No. 2, at the steep grade near the present property line of defendants Hudson and Allan, Jr., was constructed of wood. The gates were frequently closed due to the heavy dairy and cattle operations of some of the Allans.

In 1930, Allan, Sr., died. In July 1932, his estate contracted with the State of California for the relocation of the highway to the west, and the conveyance of the old highway route to the Allan estate. A condition precedent imposed by the state was the acquisition by the Allan estate of quitclaim deeds to the old highway from the MacDonalds and the other contiguous owners who, by virtue of their prior use, might have had some interest therein. In consideration for obtaining these quitclaim deeds, the Allan estate promised the grantors that they would always have access to the new highway as relocated to the west.

The relocation of the state highway also resulted in the westward extension of the road here in question and further provided this road with two additional approaches to the highway, the northern and southern branches being the former route of the old highway and the middle branch being the former access road to what is now the Point Lobos Reserve State Park, hereafter old Point Lobos road. The three branches join each other on property now owned by defendant Riley; the southern and middle branches enter the highway on property owned by defendant Riley; the northern branch traverses the Allan, Jr., property and enters the highway at a point farther north. After the relocation of the highway, the MacDonalds continued to indiscriminately use, under a claim of right, both the northern and southern branches of the old highway and the old Point Lobos road to reach the highway from their properties.

During the time of MacDonalds' ownership, the road was one-way with at least three turnouts existing along its course. It was an unpaved dirt road, subject to being impassable during foul weather above gate No. 2 except by vehicles with four-wheel drives. The use of the respective property by all parties during the early 1930's along the beautiful Pacific coastline near Carmel, was farming, cattle ranching and residential, *with the latter use slowly evolving as a major one.*

In 1932, the real property of the Alexander Allan, Sr., estate was distributed in equal undivided portions to his three daughters and one son, Allan, Jr. In 1949, one daughter (Helen A. Burnette) divested herself of any interest in the property in favor of her sisters (defendants Hudson and Riley) and brother, who thereafter severed their common ownership and partitioned the property into the separate parcels now owned by them.

On December 27, 1948, the MacDonalds conveyed their 120 acres to the Smiths, including all of the rights appurtenant to the property. The Smiths purchased their property with the intent to use it solely as a residence which was then rapidly evolving as the best use of land in the scenic area along the Carmel coastline. The Smiths found the old MacDonald cabin unsuitable as a permanent residence for themselves and did not occupy it except occasionally over weekends. However, they visited their property on the average of once a week until their new home was completed.

In November 1950, the Smiths, without obtaining permission from any source and at an expense of about $3,600, made several permanent changes in the course of the road and installed four culverts, two on their land, and two on the contiguous property of defendant, Allan, Jr. In addition, the Smiths graded and leveled the road from their property on top of the hill down to the quarry on the Riley property, about three-fourths of the total length of the road. They also surfaced this improved portion of the road with an oil and gravel topping. At that time, gate No. 2 was pushed over the hill and a cattle guard installed. After the grading had been accomplished by the Smiths, the Allans objected to the widening of the road and removal of the gate without their permission.

The road work for the Smiths had been done by Frank DeAmaral, a contractor who then owned the property to the east of Riley and Hudson and to the west of the Smiths on which he conducted a commercial quarry. Defendant Riley,

whose property adjoined DeAmaral's, continued, as she had done for many years before, to sell commercially the granite from the portion of the quarry on her land. The northern and middle branch connections to the state highway by 1932 and the road between the quarry and the dairy by 1951 were surfaced with an oil and gravel topping. This gravel surface is maintained by the customers of the quarry operated by the Riley family, who make such continued maintenance of the road part of the consideration for obtaining gravel.

After the completion of their new home, at a cost of $30,000 in November 1952, the Smiths commenced their daily use of the access road. The Smiths were quite active people and entertained a good many guests on their property. Accordingly, the general traffic on the road was greatly increased after this time. In addition, all of the Allans and the other owners of contiguous properties continued to use the access road in connection with the ownership of their various properties. By at least 1952, the traffic on the lower portion of the road from the quarry to the highway came under the additional use of the one and one-half ton trucks that then traveled back and forth to the quarry in connection with the commercial quarry operations conducted by DeAmaral and defendant Riley. Before 1955, DeAmaral, after selling all of his cattle, sold his property to Marks, who subsequently transferred it to St. John's College in May 1962.

Until 1956, while defendant Riley's dairy business existed and cows were moved daily from one pasture to another, gate No. 1 was frequently closed. However, after defendant Riley terminated the dairy operation in 1956, gate No. 1 was closed intermittently and only in connection with the movement of the residual declining cattle operations in the area conducted by defendants Hudson and Riley. In addition, after the termination of the dairy business, defendant Riley leased three homes on her property to private parties who regularly used the road for access. Since that time, the traffic on the road serving the properties of all of the parties here, including the contiguous owners, Norton, St. John's College, etc., has continually increased pursuant to the shift in the primary use of land in that area to residential. The usual amount of picnickers and others continued to travel over the road to admire the landscape as had been the custom in the years past.

In April 1955, defendants Riley, Hudson and Allan, Jr. filed a complaint against the Smiths for the 1950 alteration of the road, destruction of gate No. 2 and claimed that the Smiths had no interest or right to the road. The complaint

also alleged that the destruction of gate No 2 resulted in the destruction and loss of livestock belonging to Hudson and Riley.

In July 1955, the widow MacDonald quitclaimed to the Smiths any interest she might have in the road and conveyed "all that certain prescriptive right of way for all road purposes, of a width sufficient for, and for use by all four-wheeled vehicles, acquired by me on or about the year 1912." Thereafter, the Allans amended their complaint. In their answer and cross-complaint, filed in October 1956, the Smiths sought to quiet their title in the road. They alleged that the road had been used openly, continuously and adversely for 40 years by their predecessors and asserted their title to an easement over the road by prescription.

In November 1956, the Smiths, in an effort to obtain unquestioned use of the road, filed a petition with the Monterey County Board of Supervisors to open and lay out a private or by-road pursuant to the then section 1128 of the Streets and Highways Code,[4] and the procedures relating thereto (former §§ 1100-1132, Sts. & Hy. Code). The supervisors referred the Smiths' petition to the road commission which appointed viewers to make a report. In May 1957, the viewers completed their report and stated, insofar as pertinent, that "We inspected the present route as it now exists, this route being 8892 feet long by 30 feet wide," and they valued the lands over which the road passes at a total of $11,413.75. The Smiths were then willing to pay this amount.

At this time, *the Smiths communicated to the Allans their claim that they had the right to sell their estate in whole or in smaller parcels and that the prescriptive right-of-way appurtenant thereto would attach to each and every such apportioned parcel without overburdening the servient tenements.* The Allans, on the other hand, asserted that the Smiths could not have the road serve more than one residence on the entire 120-acre parcel of property. In April 1957, the Smiths amended their cross-complaint to claim a right-of-way for all road purposes 18 feet wide.

In May 1957, the Smiths' attorney, James A. Walker, wrote to the Allans' attorney, Thomas J. Hudson, indicating that

---

. 4The statute then provided, so far as pertinent: "Private or byroads may be opened, laid out or altered for the convenience of one or more residents or freeholders of any road district in the same manner as public roads are opened, laid out or altered, except that only one petitioner is necessary." In 1961, this entire procedure for the creation of public roads was repealed (Stats. 1961, ch. 1354, § 1).

the Smiths were willing to pay the price for a public road. *The letter indicated that the Smiths offered the Allans the right to keep the road from being made public if that is what the Allans preferred, so long as the Smiths did not lose what legal rights they then had.* Thereafter, in May 1957, the viewers' report was filed with the county board of supervisors.

On June 18, 1957, a local newspaper reported the hearing on the Smiths' petition, as set forth below.[5] Thereafter, in September 1957, the Allans' complaint and Smiths' cross-complaint were dismissed *without prejudice.* At the same time, the Smiths' attorney sent a letter to the county clerk indicating that since the road controversy had been settled "to the satisfaction of the parties," the Smiths' petition for a private or by-road was withdrawn. Shortly thereafter, a newspaper article indicated the contents of this letter. Thereafter, the supervisors acknowledged the withdrawal of the Smith petition. On October 23, 1957, Mrs. MacDonald executed another quitclaim deed to the Smiths conveying "all that certain prescriptive right-of-way for all road purposes, eighteen feet in width, required by me and my predecessors in interest on or about the year 1912."

Thereafter, the Smiths decided to sell some of their property and received a letter from their attorney, Mr. Walker, who had settled the prior litigation with the Allans. This letter, dated July 21, 1958, confirmed the Smiths' ability to divide the property and to sell any portions thereof to purchasers with the right to use the access road. The letter pointed out that if any purchaser ever had his right-of-way questioned by any of the owners over whose land the road crossed, he could petition the county board of supervisors for a deed pursuant to section 1128 of the Streets and Highways Code.

Thereupon, the Smiths listed 40 acres of their 120-acre parcel with plaintiff, Virginia Nielson, a family friend and real

---

[5]"The Smiths are seeking an access road over the Hudson family's property to maintain top property they own to the east of it.

"In a court-room-like hearing, Smith said he had a prescriptive right-of-way, established by use, over the land.

"Right of Way

"Hudson, who disqualified himself from board action, and his mother, testified they offered the Smiths a deeded right-of-way, reserving the right to maintain cattle gates and fences and asking that the Smiths not subdivide their property.

"Smith replied he felt such an agreement restricting use of his property was not fair to him or his heirs.

"'I don't like to tie myself down,' he said. 'I don't know what the future will bring as far as selling a few lots off goes.'"

estate saleswoman (hereafter Mrs. Nielson), and showed her the letter from Mr. Walker. Between December 2, 1958 and October 5, 1959, by three different conveyances, the Smiths conveyed record title of their acreage to Mrs. Nielson and her associates[6] for a purchase price of $500 per acre, plus $20,000 for the Smith home. Each of the three conveyances included an interest in the right-of-way. The title insurance policies issued set forth a description of the prescriptive right-of-way but did not insure it as such.

Mrs. Nielson did not request such title insurance as she believed that the purchasers had the unquestioned rights to the roadway and to sell the land in parcels with an attached easement. She based this conclusion on her own observation and use of the right-of-way since 1952, which had never been challenged; her conversations with the Smiths and their assurances concerning their right to use the road; the above mentioned letter of July 21, 1958, from Mr. Walker, confirming the Smiths' ownership of a right-of-way and their ability to convey and apportion the same; her conversation with one of the contiguous owners, Mr. Norton, who had handled the sale of the MacDonald property to the Smiths, in which she was assured that she would have the same right to use the road as he had; and her contemporaneous reading of the numerous newspaper articles, referred to above, concerning the Smith-Allan road litigation, which indicated that the road dispute had been settled.

Prior to their purchase, none of the plaintiffs had ever communicated with the Allan heirs regarding the right to the use of the road. After the purchase, the Smith home was leased to tenants who continued to use the road, along with all of the plaintiffs, individually or collectively as a group, and with their families. None of these uses of the road have ever been denied.

As early as 1960, the Allans initiated a formal study of the potential future use of their properties. The study was performed by Francis L. Whisler, a licensed architect and son-in-law of defendant Riley. Richard Raymond Associates confirmed to Whisler that the highest and best use of the Allan properties was residential. Accordingly, in November 1962, Whisler prepared a master plan for the Allan properties to the east of the highway, proposing the construction of 30-35 homesites and necessitating the destruction of the present

[6]Plaintiffs, R. W. Wright, G. S. Pulford, V. E. Klevesahl, C. P. Gray and H. C. Zweng.

road and the absence of any road in the general area where it presently exists. Later, an alternate plan was drafted which envisioned construction of 20-28 homesites and retention of a small portion of the existing road. However, defendant, Estate of Allan, Jr., has not agreed to either of these plans nor have any users of the road, other than perhaps some of the defendants.

In June 1960, a zoning ordinance applicable to the Nielson property was enacted and limits the use of all of the property to one-family residences on a minimum of one acre. In August 1960, Judith K. Howell, subsequently Mrs. Peter H. Mutke, entered into an agreement for the purchase of 10 acres from the Nielsons at a purchase price of $3,000 per acre, for the purpose of building a residence. This agreement contained a 5-acre minimum building site restriction to run with the land until January 1, 1985.

Thereafter, in 1961, the Nielsons spent about $7,500 on surveying and bulldozing their property. In June 1961, they contracted to spend an additional $10,000 to resurface with an oil and gravel topping the upper three-fourths of the road from their property to the quarry in the same manner and fashion as the Smiths had done in 1950. Thereafter the Allans, while admitting the right of the Nielsons to use the road, orally asserted that the original widening of the road by the Smiths in 1950, as well as their removal of gate No. 2 and installation of the cattle guard, and the resurfacing by the Nielsons in 1961, were only permissive in nature. The Allans repeatedly solicited the Nielsons to reduce to a formal writing their use of the road in accordance with the Allans' assertions that the Nielsons' interest was a mere license. The Nielsons, not wishing to risk abandonment or loss of any of their rights for a mere license, consistently ignored the requests of the Allans.

On June 20, 1961, the Allans' attorney wrote a letter to Mrs. Nielson as agent for the Nielsons, confirming an earlier verbal conversation that the Allans had only given to the Nielsons a license such as they had given to the Smiths in 1950 to widen and surface the road from the top of the hill to the quarry. He also sought an agreement that the additional width of the surfaced road beyond the traveled portion as it existed prior to the road work done by the Smiths in 1950 would not become a part of the Nielsons' prescriptive easement in the route and that the cattle guard installed instead of gate No. 2 by the Smiths in 1950 with the permission of the Allans would be removed and new gates installed to replace

No. 1 and No. 2. For the reasons stated above, the Nielsons did not reply to this letter.

Thereafter, Mrs. Nielson and the Allans' attorney had another disagreement concerning the Allans' assertion that the Nielsons could not use the road to serve more than one residence on the entire 120-acre parcel conveyed by the Smiths to the Nielsons. As in the instant litigation, the Allans took the position that the resulting traffic would overburden their servient tenement; the Nielsons, that they could develop and apportion their property and convey therewith to each apportioned parcel an appurtenant right-of-way to use the road, as such use would not overburden the Allan properties.

In November 1961, the Nielsons signed protective restrictive agreements providing for covenants to run with the land, limiting ownership to not less than 5 acres per single residence, as in the 1960 agreement with Mrs. Mutke. Thus, not more than 24 residences were contemplated on their property until 1985. Thereafter, in November 1961, the Nielsons deeded a 5-acre parcel to cross-defendants Rothwell and in March 1962, a 5-acre parcel to cross-defendants Dutton for a purchase price of $3,000 per acre. Each deed contained the covenant running with the land mentioned above and purported to convey a nonexclusive right to use the road. The Rothwells and the Duttons both intended to build a residence on their respective parcels.

Thereafter, on July 13, 1962, the Allans' attorney again wrote to plaintiffs, Mrs. Nielson, Wright and Klevesahl, threatening legal action unless they agreed to a written agreement formalizing their right to use the road as a mere license in accord with his previous letter. The Nielsons did not answer this letter but contacted the Smiths who reaffirmed their position concerning the rights in the road. In 1962, Mrs. Nielson and her associates formalized their partnership by executing a written agreement providing for the partners' equal undivided interests in the 120 acres to be managed by Mrs. Nielson.

Sometime before 1963, in a conversation with Dr. Mutke, the Allans' attorney (Mr. Hudson) learned of the Mutkes' plans to construct a home on the 10-acre parcel acquired from the Nielsons. At this time, Mr. Hudson asserted that the right-of-way could not be used to serve more than one home for the entire 120-acre parcel that the Nielsons had acquired from the Smiths. At the same time, Mr. Hudson purported to grant to Dr. Mutke a temporary license to use the road, and indicated

that the Allans were planning to replace the cattle guard at gate No. 2 and demand that both of the gates be kept closed. The contents of the above conversations were confirmed by a letter dated February 8, 1963, from Mr. Hudson to Dr. Mutke and his attorney, Mr. Stewart. Thereafter, orally, Mr. Hudson in a conversation with Mr. Stewart reiterated the denial of all rights to use the road to serve more than one home on the entire parcel.

On March 20, 1963, Dr. Mutke sent a copy of the above letter to Mrs. Nielson and indicated that Mr. Stewart would be communicating with her. On August 2, 1963, Mr. Hudson sent another letter to Mr. Stewart confirming this conversation and asserting that Dr. Mutke had no right-of-way at all, that steps would be taken to prevent Dr. Mutke from trespassing on the property of the Allans, and reiterating the matter relating to the closed gates. Mr. Stewart forwarded this letter to the Nielsons on August 13, 1963.

On August 23, 1963, the Mutkes commenced an action (No. 55676) against Mrs. Nielson and her associates for specific performance, or in the alternative, for damages for breach of contract and sought a deed to the right-of-way free from any cloud on title. Thereafter, Mrs. Nielson and her associates, on advice of counsel, entered into the following settlement with the Mutkes: the rescission of the purchase agreement; refund to the Mutkes of installments they had paid ($13,100) plus $750 by way of settlement; and the dismissal with prejudice of the Mutke action. The Nielsons' attorney fees and costs in connection with defending and settling the Mutke matter were $4,410.50.

Thereafter, on November 8, 1963, Mrs. Nielson and her associates filed this action. Since that time, there has been no change in the course or characteristics of the road except for the installation of a new gate instead of the cattle guard at No. 2. This new gate was installed by defendant Hudson without the consent of the Nielsons. The complaint sought: (1) to quiet title to a nonexclusive right-of-way appurtenant to all of Nielsons' property which would attach to each part thereof in the event of the subsequent apportionment of the dominant tenement; (2) declaratory relief with respect to the agreement between the Smiths and the Allans concerning the right to use the road and the conveyance thereof that resulted in a settlement of the Allan and Nielson action in 1957; (3) damages for disparagement of title with respect to the Mutke matter; and (4) in the alternative, for a public road. The Allans answered and filed both a counterclaim and cross-

complaint to quiet their title to all of the right-of-way, to enjoin the Nielsons from using the access road for more than one residence and for damages for disparagement of title because of the instant action, including in their cross-complaint the Rothwells and Duttons.

The matter was heard by the trial court without a jury. The court viewed the premises and found the facts as stated above. It also found that the Nielsons' present and contemplated use of the road will not significantly interfere with the present uses made by the Allans of the lands over which the road passes. The judgment decreed that: (1) the Nielsons and their grantees were entitled to quiet title to a nonexclusive pre-scriptive easement in an 18-foot-wide one-way road with room for passing and at least three turnouts existing along the course of the road from their property to the highway, includ-ing its three branches; the surface of the right-of-way could be maintained by the Nielsons and their grantees in its exist-ing condition which could not be altered; defendant Riley could maintain gate No. 1 provided the Nielsons and their grantees could pass through it freely; the other defendants could maintain a cattle guard but not a gate at No. 2; the right-of-way was appurtenant to all of the 120 acres and could be apportioned as such to every part of their property conveyed; (2) the use of the property for residential purposes made and contemplated by the Nielsons and their grantees and being limited to one residence for each 5 acres does not overburden the servient tenements. If, at a later time other uses beyond those now contemplated were made, the Allans could bring an action to prevent any such overburdening; (3) the Allans and their grantees were permanently enjoined from interfering in any way with the use or contemplated use or maintenance of the right-of-way by the Nielsons and their grantees; (4) the road was not a public road; and (5) none of the parties was entitled to damages for disparagement of title.

This appeal by the Allans from the entire judgment and the cross-appeal by the Nielsons from the portion of the judgment denying them damages for disparagement of title in the Mutke matter, ensued.

## I. THE ALLANS' APPEAL FROM THE JUDGMENT

The Allans concede the prescriptive right to an easement for the purpose of gaining access to a single residence on the 120 acres owned by the Nielsons, but maintain that any use of the right-of-way for access to any additional residences and particularly the 24 contemplated by plaintiffs unduly burdens

484

their servient tenements. They apparently do not dispute the fact that the use of the easement for the major portion of time here involved was access for residential purposes.

■ The applicable principles as set forth in sections 478 and 479 of the Restatement of Property are as follows: Section 478: "In ascertaining whether a particular use is permissible under an easement created by prescription a comparison must be made between such use and the use by which the easement was created with respect to (a) their physical character, (b) their purpose, (c) the relative burden caused by them upon the servient tenement." ■ Section 479: "In ascertaining whether a particular use is permissible under an easement appurtenant created by prescription there must be considered, in addition to the factors enumerated in § 478, the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement."

The comments that accompany section 479 are particularly applicable to the facts of the instant case. They point out that the use of all land is subject to constant change because of natural forces and human activities and that the extent of an easement created by prescription can never be exactly measured by the condition of the dominant tenement during the period of prescription, although any future use is, to some degree, limited thereby. Uses satisfying new needs are privileged if the condition requiring them is a *normal development* of the condition, the needs of which were served by the adverse use that created the easement. As to normal development, the comment states: "A normal development is one which accords with common experience. *It is, therefore, one which might reasonably have been foretold.* Such use, however, must be consistent with the pattern formed by the adverse use by which the prescriptive easement was created." (Italics added.)

The Allans, citing *Bartholomew* v. *Staheli*, 86 Cal.App.2d 844 [195 P.2d 824], argue that the result here reached by the court below is contrary to the rule that the extent of a prescriptive easement is determined by the user under which it was acquired. In *Bartholomew*, the defendants, their families and personal guests had for more than 10 years used a private roadway across plaintiffs' land to reach the defendants' farmhouse. Sometime before the commencement of the action, defendants had organized and maintained a nudist colony on their ranch, a resort for renting cottages, and a public dining

room. The expansion of these enterprises during the 2-year period preceding the action caused increased travel over the roadway with as many as 500 automobiles per week during the summer. The appellate court, citing the familiar rule that the extent of a prescriptive easement is determined by the user under which it was acquired, affirmed the lower court's holding that the defendants, their families and employees had acquired an easement in the roadway for traveling to and from defendants' property as a single family farm but not for resort, commercial or subdivision purposes.

However, the Allans, in arguing that the extent of the prescriptive easement is determined by the user under which it was acquired cannot rely solely on the user in the first prescriptive period beginning in 1912 under the MacDonalds. The Smiths extended the user in the period from 1948 to 1957 when it became apparent to all concerned that the character of the dominant tenement had clearly changed to residential and that the subdivision thereof was reasonably to be anticipated. The fact that such a change had occurred was further indicated between 1958 and the filing of this suit in 1963, during which time sales of parcels of the Smiths' land for subdivision purposes actually took place.[7]     The law is clear that the character of an easement may be changed or enlarged by an additional or different user for a subsequent prescriptive period (*Beyl* v. *Yasukochi*, 135 Cal.App.2d 638, 640 [287 P.2d 863]). The crux of the dispute here is whether the use of the easement by 24 additional residences exceeds the general outlines of the prescriptive right acquired by adverse user over the years, as the Allans contend, or whether it is merely a change in the degree of the established use, as the Nielsons contend.

The Nielsons rely chiefly on *Gaither* v. *Gaither*, 165 Cal. App.2d 782 [332 P.2d 436], the first California case to adopt the theory set forth in section 479, without, however, specifically citing the Restatement. In *Gaither*, the court held that the increased use of a right-of-way acquired by prescription as a driveway to a residence and access to a farm, by occupants of rental units placed on the dominant tenement, was a permissible change in degree. The court, however, held that this permissible change in degree did not extend to the bur-

---

[7] We are not concluding that the sales themselves, made after the beginning of the last prescriptive period, in any way extended the user. The subsequent conduct merely emphasized and corroborated the user which had previously been established in the normal development of the dominant tenement.

dening of the driveway by the use of house trailers and the increased use as an access to a trailer park. The court in *Gaither* relied on the leading case of *Baldwin* v. *Boston & M.R.R.*, 181 Mass. 166 [63 N.E. 428], wherein the findings showed there had been two buildings, a dwelling house occupied by one family and a stable, on the dominant estate during the applicable prescriptive period controlling the acquisition of a right-of-way. Subsequently, two or more houses were built on the lot, so that five families lived on the lot instead of one. Holding that the use of the way extended to the tenements of the new houses, the court reasoned that the lot was the same, was small in size, and there could never be many dwelling houses upon it, and the only change proposed in the use of the way was that more pedestrians might use it than before; that there had been no increase of burden on the servient estate; and that the change in the use of the land had been only in degree and not in kind.

In view of the evolution of the dominant and servient tenements here from a primarily agricultural one in 1912 to a primarily residential one by 1958, we must apply the test of reasonable foreseeability discussed above. As indicated by the Restatement, no use can be exactly duplicated. The inevitability of change dictated by natural forces and human activities requires that subsequent users under prescriptive easements must vary in some degree from the users by which the easements were created. The real question is whether the Nielsons' present and contemplated use of the easement as an access road for 24 additional homes on their 120-acre parcel was a reasonably foreseeable development of the dominant tenement as it evolved during the various prescriptive periods and whether a substantial increase in the servient tenement would result.

The uncontroverted evidence indicates that although during the early 1930's the properties of all of the parties were used for dairy, cattle and residential uses, the latter was already evolving as the dominant use of the beautiful stretch of coastline here involved. By the late 1950's, most of the major agricultural operations ceased and from then on, the primary use of most of the land (with the exception of the small quarry operation carried on by the Rileys) was residential. Some of the defendants then rented out some of the homes on their property. At the time of the 1957 action between the Allans and the Smiths, the Allans were well aware of the fact that the Smiths were planning to develop the property. This evolution of a residential use is further attested to by the

studies and plans made in 1960 and 1962 by the Allans for the subdivision of their own properties. These likewise indicated that this was the highest and best use of the land involved and that the maximum number of residential lots on the Allan properties would require the elimination of the existing road and the easement appurtenant thereto.

Thus, it cannot be questioned that at the beginning of the last prescriptive period here involved, namely, from 1958 to 1963, the subdivision of the dominant tenement was a normal foreseeable use. The Allans argue that there was nothing they could do to protect themselves prior to the actual subdivision. But the record indicates that their action filed against the Smiths in 1955 encompassed claims by both sides with respect to the use of the road, identical to those made here. That action was dismissed in 1957 after the Smiths agreed to withdraw their petition for a public road while openly declaring that they were not giving up any of their legal rights thereby. The effect of this dismissal was to remove the tolling of the statute of limitations that had occurred on the filing of the action (*Yorba* v. *Anaheim Union Water Co.*, 41 Cal.2d 265, 270 [259 P.2d 2]) and the last prescriptive period here involved (1957-1963) began with the Allans' inaction in face of the Smiths' claim (by then a matter of public record) that they could apportion their easement with the sale of any part of their property and the continued declaration by the Smiths that they intended to subdivide and sell off their property.

■ We turn next to the Allans' contention that even if the trial court applied the proper legal theory, the evidence does not support the finding that the use of the easement by an additional 24 homes on the Nielson property would not substantially burden the servient tenement and interfere with the Allans' use of their properties. ■ Where, as here, the evidence is conflicting, each one of the elements giving rise to a prescriptive easement is a question of fact to be determined by the trial court (*Kerr Land & Timber Co.* v. *Emmerson*, 233 Cal.App.2d 200, 233 [43 Cal.Rptr. 333]). ■ The Allans' contention is based on the testimony of their witnesses that since the Nielsons' acquisition of the property, traffic over the road had increased and substantially interfered with their present use of the property for agricultural purposes, namely, the breeding of beef cattle and quarter horses.

However, there was also evidence indicating that the present agricultural operations of the Allans were very small scale in nature. It is uncontroverted that the dairy operations

ceased in 1956 and there were no dairy cattle on the Allan properties after 1959. Mrs. Elizabeth Riley Wilson, the daughter of one of the defendants, testified that after the dairy closed, there were about 60 head of cattle on the property and that the horse breeding operation was even smaller, as most of the horses were boarders. It is also uncontroverted that the beef cattle presently raised by the Allans did not require the same amount of frequent movement from pasture to pasture as the dairy cattle had and that the gravel trucks, as well as occasional sightseers, continued to use the road. In addition, the trial court had an opportunity to view the area. We conclude that there is ample evidence to sustain its finding that there was no substantial increase in the burdening on the Allans' properties or interference with their present agricultural uses.

Although the Allans' appeal is from the entire judgment, including the denial of the relief requested in their cross-complaint, namely, damages for disparagement of title by the instant action with respect to the Hudson and Riley properties transversed by the right-of-way, no contentions pertinent thereto were raised in their extensive briefs. Consequently, we are not called upon to comment on the issue here.

II. THE NIELSONS' CROSS-APPEAL FROM A
PORTION OF THE JUDGMENT.

The only question on the cross-appeal relates to the trial court's denial of relief on the Nielsons' cause of action for the Allans' alleged disparagement of title in the Mutke matter.

As indicated in the statement of facts above, in 1960, Dr. Mutke's fiancee had signed an agreement with the Nielsons for the purchase of a 10-acre parcel of property. In 1963, the Allans' attorney, Mr. Hudson, learned of Dr. Mutke's plan to build a home on the property. Thereafter, on February 8, 1963, Mr. Hudson wrote a letter to Dr. Mutke and sent copies to the latter's attorney, Mr. Stewart, and Mrs. Nielson. The letter stated that Dr. Mutke had no right to use the road for access to his property and indicated that the county planning commission would be informed that Mrs. Nielson's proposed subdivision of the property violated the subdivision map act. On February 15, 1963, Mr. Hudson wrote a letter to the county council with a copy to the county planning director accusing Mrs. Nielson of violating the subdivision map act in the sale to Dr. Mutke and in several other unrelated transactions. Hudson also had a telephone conversation with Mr.

Stewart, and sent him another letter dated August 2, 1963. This letter was forwarded to Mrs. Nielson by Mr. Stewart.

Thereafter, on August 23, 1963, the Mutkes filed action No. 55676 against the Nielsons for specific performance or damages and a deed to the right-of-way, free from any cloud on title. The final outcome of the matter was a settlement in 1964 whereby the Mutkes' purchase agreement was rescinded, their installments of $13,100 refunded, $750 paid in settlement, and their action against the Nielsons dismissed with prejudice. The Nielsons' costs and attorneys' fees in defending and settling the Mutke matter were $4,410.50. The 10 acres the Nielsons had sold to the Mutkes for $3,000 per acre in 1960 had increased in value to $4,000-$4,400 per acre by the time of the trial in the instant case, 5 years later.

On their cross-appeal, the Nielsons contend that they proved their cause of action for disparagement of title and that the trial court erred in denying them compensatory and punitive damages merely because the property reacquired from the Mutkes had increased in value. We cannot agree.

■ Disparagement or slander of title is a publication made without a privilege or justification of matter that is untrue and is disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as a purchaser or lessee thereof might be determined thereby and that results in pecuniary loss from the impairment of vendability thus caused (Rest. Torts, § 624, quoted in *Gudger* v. *Manton,* 21 Cal.2d 537, 541 [134 P.2d 217]). ■ If the matter is reasonably understood to cast doubt upon the existence or extent of another's interest in land, it is disparaging to the latter's title where it is so understood by the recipient (Rest. Torts, § 629, quoted in *Kalajian* v. *Nash,* 148 Cal.App.2d 495 [306 P.2d 921]). ■ The damage usually consists of a loss of prospective purchaser or lessee and the expense of litigation to remove the doubt cast on the title (Rest. Torts, § 633). However, it is not necessary to show that a particular pending deal was hampered or prevented, since recovery may be had for the depreciation in the market value of the property (*Davis* v. *Wood,* 61 Cal.App.2d 788 [143 P.2d 740]).

Thus, the first question is whether the publication of the disparagement was without privilege or justification. ■ The burden of proof of the lack of privilege is on the plaintiff (*Spencer* v. *Harmon Enterprises, Inc.,* 234 Cal.App.2d 614,

622 [44 Cal.Rptr. 683]). ▉ Although the gravamen of an action for disparagement of title is different from that of an action for personal defamation, substantially the same privileges are recognized in relation to both of these torts in the absence of statute. Questions of privilege relating to both torts are now resolved in the light of section 47 of the Civil Code (*Albertson* v. *Raboff*, 46 Cal.2d 375, 378 [295 P.2d 405]). Subdivision 3 of section 47 states, so far as pertinent, that publications by a defendant who is seeking to protect his own interests are conditionally privileged. ▉ In the application of this privilege (either pursuant to the statute or independent of it), the courts have long recognized that a rival claimant of property is privileged to disparage or is justified in disparaging another's interest in the property by an honest and good faith assertion of an inconsistent legally protected interest in himself (*Spencer* v. *Harmon Enterprises, Inc., supra*; *Gudger* v. *Manton, supra*, p. 545).

▉ The Nielsons' claim for damages for disparagement of title is based on the 5 communications described above briefly identified in the footnote below.[8] Although there is some question concerning the requisite publication as to Dr. Mutke and his counsel (*Farr* v. *Bramblett*, 132 Cal.App.2d 36, 46 [281 P.2d 372]), we will not discuss the matter in detail as there is ample evidence to indicate that Mr. Hudson, as an owner of a portion of the servient tenement, as well as the manager of the Allans' properties and their attorney, was merely exercising the privilege of a rival claimant. As indicated above, lack of privilege is an essential element of the cause of action. The conditional privilege of a rival claimant or interested party is always available whenever the statements are made without malice. Here, there was no finding or evidence of malice. Although the Nielsons correctly point out malice in fact is no longer required (*Gudger* v. *Manton, supra*), there was no basis for implying the requisite malice in law. Malice will not be inferred from the mere fact of communication (Civ. Code, § 48). The Nielsons' right to apportion the easement was not

[8] (1) Mr. Hudson's oral conversation with Dr. Mutke shortly before February 8, 1963.

(2) Mr. Hudson's letter of February 8, 1963, to Dr. Mutke and his attorney, Mr. Stewart.

(3) Mr. Hudson's telephone conversation with Mr. Stewart after the February 8 letter.

(4) Mr. Hudson's letter of February 15, 1963, to the Monterey County Council with a conformed copy to the Monterey County Planning Director.

(5) Mr. Hudson's letter of August 2, 1963, to Mr. Stewart.

definitely and legally determined until the conclusion of the instant action. The Nielsons have not met the burden of showing that Hudson abused his privilege or that the statement was made with the necessary malice in law. Thus, it is not necessary to discuss their contention relating to the increase of value in the property or punitive damages which are recoverable only where actual damages are awarded (*Brewer* v. *Second Baptist Church*, 32 Cal.2d 791 [197 P.2d 713]).

The Nielsons, however, contend that the above reasoning cannot be applied to Mr. Hudson's communications to the county officials concerning Mrs. Nielson's alleged violation of the subdivision map. We hold that these were likewise made by Mr. Hudson in exercise of conditional privilege, that a finding of no malice would be justified, and that the trial court properly held that the Nielsons were not entitled to damages for disparagement of title in the Mutke matter.

The judgment is affirmed in its entirety.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied March 28, 1968, and the petition of the defendants, cross-complainants and appellants for a hearing by the Supreme Court was denied April 24 1968. Traynor, C. J., Peters, J., and Sullivan, J., were of the opinion that the petition should be granted.