[Civ. No. 1921. Fifth Dist. Nov. 30, 1973.]

FRED L. PIPKIN et al., Plaintiffs and Respondents, v.
TED DER TOROSIAN et al., Defendants and Appellants;
FREDDIE D. BOYDSTUN et al., Defendants and Respondents.

**COUNSEL**

Leonard J. Zins for Defendants and Appellants.

Wild, Christensen, Carter & Hamlin, Robert G. Carter and James H. Christiansen for Plaintiffs and Respondents.

James V. Gregory for Defendants and Respondents.

## OPINION

**BROWN (G. A.), P. J.**—This appeal arises out of an action relating to the establishment of easements across real property located at or near the northeast corner of East Kings Canyon Road and Temperance Avenue, Fresno, California. An illustrative schematic drawing is attached as Appendix 1 as an aid to understanding the location and relationships of the various parcels of property and claimed easements.

The material evidence is not in dispute and the questions we are to resolve are essentially ones of law.

At the northeast corner of Kings Canyon Road and Temperance Avenue is the Leonard property. Contiguous to the Leonard property on the north and also extending along Temperance Avenue is a 20-acre parcel. Prior to January 1965 the entire 20 acres were owned by Ted Der Torosian, Avedis Der Torosian, Johnny Der Torosian, Haigos Der Torosian, Levon Der Torosian, Margaret Vulich, Satenig Aaron and Mariam Pistoresi and their predecessors (hereinafter collectively referred to as "Torosians"). For 30 to 35 years the Torosians farmed this 20-acre parcel though they resided elsewhere.

The property which is now owned by Freddie D. Boydstun and Barbara Ann Boydstun (hereinafter "Boydstuns") is located immediately to the east of the Leonard property extending along Kings Canyon Road. It has the same depth from Kings Canyon Road to the north boundary line as the depth of the Leonard property.

Although the western edge of the Torosians' property fronts on Temperance Avenue, for 30 to 35 years the Torosians traveled to and from their 20-acre parcel by proceeding from Kings Canyon Road north along a road which is located on the westerly side of the property now owned by the Boydstuns, extending between points "A" and "B" (hereinafter designated the "Boydstun Road"). The Torosians did not enter onto or depart from their property by Temperance Avenue. The Torosians used the Boydstun Road for the movement of bailers, cultivators, tractors, automobiles, trucks and other farm equipment in connection with or incidental to the farming of the 20-acre parcel.

Immediately to the north of the Boydstun property are the Ferriea and Barra properties, upon each of which is located a family home. The owners of those properties own a 30-foot granted easement of ingress and egress along the westerly 30 feet of the Boydstun property between points "A" and "B." They also have a 30-foot granted easement across

the westerly 30 feet of each other's property between points "B" and "C." These easements are for ingress and egress to their homes and to the surrounding acreage which is used for agricultural purposes.

In January 1965 Fred L. Pipkin and Evelyn N. Pipkin (hereinafter referred to as "Pipkins") purchased from Torosians the eastern one-half of the 20-acre parcel. They also procured a granted 30-foot easement along the western edges of Ferriea and Barra's properties between points "B" and "C."

Between January 1965 and February 1970, a period in excess of the prescriptive period, the Pipkins also used the Boydstun Road between points "A" and "B" for access to their new farming operation on the 10-acre parcel which they had purchased from Torosians. They planted the acreage to almonds and consistently used the Boydstun Road for access to the 10 acres.

On rare occasions the Pipkins would go onto their property or depart from their property by traveling between points "E" and "D" along the northern edge of the 10-acre parcel retained by the Torosians which connects with Temperance Avenue. The Pipkins used this route infrequently and only when convenient, such as for going to the store. They would only drive this route with their pickup since a car would be scratched by the vines growing on the Torosians' property. There was insufficient clearance for the passage of farm equipment.

Because of controversy with the Boydstuns over the use of the Boydstun Road for serving the Pipkins' 10-acre property, the Pipkins commenced this quiet title and declaratory relief action against the Torosians seeking (1) an easement by necessity over the northern 15 feet of the Torosians' property between points "E" and "D," (2) an easement by implication over the Torosians' property between points "E" and "D," (3) an easement by prescription across the westerly 30 feet of the Boydstun property between points "A" and "B."

After a trial before the court, sitting without a jury, the judge in substance found that the Pipkins and their predecessors had used for the prescriptive period the westerly 30 feet of the Boydstun property ". . . as an easement and right-of-way of ingress and egress to [Pipkins'] property for agricultural and cultivation purposes," and that the easement ". . . was not for residential use or for the servicing of residential dwellings located on the property of [the Pipkins]." The court also found that the Pipkins' property was landlocked for residential use and "[t]hat a strict necessity exists for an easement for pedestrian and vehicular traffic across the land

retained by [the Torosians] . . . to allow [the Pipkins] to use their land for *residential purposes.*"

From these findings the court concluded in substance that the Pipkins have an easement by prescription of ingress and egress across the westerly 30 feet of the Boydstun property between points "A" and "B" "for agricultural uses and cultivation of said parcel of property owned by [the Pipkins] and any use incidental to such agriculture and cultivation." The court also concluded that the Pipkins have an easement by necessity across the northerly 15 feet of the Torosians' property to Temperance Avenue between points "E" and "D" "for any use by [the Pipkins] as access to the property which access is not otherwise available to [the Pipkins] by reason of the easement of adverse possession across the property of [Boydstuns] . . . and specifically for pedestrian and vehicular traffic to service said property for residential purposes."

Judgment was entered accordingly. Torosians have appealed.

To narrow the issues, we observe that no question has been raised relating to the sufficiency of the evidence to establish an easement by prescription over the Boydstun property and, as we have mentioned, there is no real conflict in the evidence with respect to the nature and extent of the use made of the easement during the prescriptive period. The parties agree that the use of this right of way by Pipkins was to pass over it by foot, by automobile, by truck, by tractor, and by all types of agricultural equipment. It is also admitted that Pipkins' property during this period of time was used for agricultural purposes only.

■ The pivotal issue is whether the court erred in defining the extent and scope of the easement over the Boydstun property exclusively in terms of the use (agricultural and cultivation) to which the dominant tenement was put during the prescriptive period, and excluding the use of it for pedestrian and vehicular traffic to service the Pipkin property for residential and other purposes.

Civil Code section 806 provides in relevant part: "The extent of a servitude is determined by . . . the nature of the enjoyment by which it was acquired." In *O'Banion* v. *Borba* (1948) 32 Cal.2d 145, 155 [195 P.2d 10], the Supreme Court stated the established principle: ". . . the rights thus acquired are limited to the uses which were made of the easements during the prescriptive period. [Citations.] Therefore, no different or greater use can be made of the easements without defendants' consent."

We have concluded that it is the nature, character and volume of the usage of the easement during the prescriptive period which determines its

scope and that the use to which the dominant tenement is being put during that period is only one factor that may be germane in defining that use; to make the use of the dominant tenement the only criteria by which the scope and extent of the easement is defined is legal error. The language "the nature of the enjoyment" as used in Civil Code section 806 refers to the use made of the easement during the prescriptive period—not solely to the use made of the dominant tenement, the latter being only one relevant factor to consider insofar as it affects the quantitative-qualitative use of a prescriptive easement.

The Restatement has adopted this view and it has support in California cases. Section 478 of the Restatement of Property states: "In ascertaining whether a particular use is permissible under an easement created by prescription a comparison must be made between such use and the use by which the easement was created with respect to (a) their physical character, (b) their purpose, (c) the relative burden caused by them upon the servient tenement."[1]

Thus the purpose of the use is only one of the factors to be considered.

In *Gaither* v. *Gaither* (1958) 165 Cal.App.2d 782 [332 P.2d 436], the parties to a common driveway had, over the necessary prescriptive period, used the driveway in connection with their respective home and for ingress and egress to their contiguous properties for farming purposes. Within two years of the filing of the declaratory relief action, respondent constructed two rental houses and the tenants used the driveway for access thereto. Finally, respondent obtained a license to rent parking space for

---

[1]The comment to section 478 of the Restatement of Property further elaborates: "*a. Permissible variations of use.* Since no use can ever be exactly duplicated, some variation between the use by which a prescriptive easement was created and the uses made under it after its creation is inevitable. The problem is to ascertain the limits of permissible variation. In many cases this problem will be one of easy solution. Uses that in effect continue or repeat those which gave rise to an easement are clearly permissible under it. On the other hand, uses having no connection with or resemblance to the adverse use by which an easement was created are not permissible under it. In other cases, the solution may not be easy. Whether easy or difficult, the general principle applicable is that a use made under a prescriptive easement must be consistent with the general pattern formed by the use by which the easement was created. The variations permitted between the uses made under a prescriptive easement and the adverse use by which it was created are those only which are consistent with that pattern. Uses which conform to it must have characteristics sufficiently resembling those of the adverse use by which an easement was created so that they may fairly be described as being the same use. The characteristics most important for the purpose of determining the existence of the necessary likeness are those of (1) the physical attributes of the two uses, (2) their purposes, and (3) their relative burdens upon the owner of the servient tenement. This enumeration of characteristics should not be understood as indicating that they are to be applied in the order stated or in any other particular order."

12 house trailers on her property. Appellants retaliated by erecting a fence bisecting the driveway on its center line (the boundary line between the parties' properties), and the lawsuit followed.

The trial court found that at the time the driveway was constructed (1945) both parties were using their properties for residential purposes and for rentals for living purposes. The appellate court specifically found no evidence to support the trial court's finding of rental use over the requisite five-year prescriptive period. Therefore, the appellate court faced the issue of whether the driveway could be used in connection with the rental units and the proposed house trailers, even though the original use was for residential and farming purposes. The court held that: "As to the increased burden in connection with the rental units, such use appears to be one in degree only and not a change in the physical objects passing over the driveway. Impliedly the parties so treated this additional use. If the change is not in the kind of use, but merely one of degree imposing no greater *burden on the servient* estate, the right to use the easement is not affected. [Citations.]" (165 Cal.App.2d at p. 785; italics added.)

Facing the second issue, of the scope of the prescriptive use as it related to the house trailers, the court stated that: "However, the fact that the driveway was used for ingress and egress for residential and farming purposes does not necessarily, as a matter of law, show such use was broad enough to give the right to drive house trailers over the driveway, nor to permit *the driveway to be burdened with the increased uses* which would result from the operation of the trailer park, including the use by the occupants thereof. In such a case there is an *actual change in the physical objects passing over the road.* Such a change would. be radical, and the driveway cannot be used for the new purpose required by the altered condition of the respondent's property due to the trailer park. Such a use would be a substantial change in the *nature of the use and* a consequent increase of burden upon the servient estate. It would be something more than a change in the degree of use." (165 Cal.App.2d at pp. 785-786; italics added.) (See *Hill* v. *Allan* (1968) 259 Cal.App.2d 470 [66 Cal.Rptr. 676].)

Reason supports this conclusion. For example, assuming a home should be built on the Pipkins' property, it should be of no moment to the Boydstuns whether persons riding in a pickup or automobile over the easement are going to the Pipkins' property for the purpose of going to the home or for the purpose of cultivating crops so long as the amount of traffic is not substantially increased. On the contrary, restricting the use of the easement to servicing Pipkins' property for agricultural purposes does not guarantee or prevent a possible radical change in the burden upon the servient

estate. Such a change in burden could occur by an increase in the intensity of use, change in the crop pattern or in the method of farming the dominant tenement.

■ The ultimate criterion in determining the scope of a prescriptive easement is that of avoiding increased burdens upon the servient tenement (*Bartholomew* v. *Staheli* (1948) 86 Cal.App.2d 844 [195 P.2d 824]) while allowing some flexibility in the use of the dominant tenement (*Hill* v. *Allan* (1968) 259 Cal.App.2d 470 [66 Cal.Rptr. 676]).

Applying these principles to the facts in the case at bench, we conclude that the court erred in defining the prescriptive easement exclusively in terms of the use to which the dominant estate was put during the prescriptive period and that it should be defined in terms of the right to pass and repass over the same by foot, by automobile, by truck, by tractor and by all types of agricultural equipment, provided that the nature, scope and extent of the use does not substantially increase the burden placed upon the servient tenement as it existed during the period that the prescriptive easement was acquired.

Whether such uses go beyond the extent and scope of the easement is a matter for future determination of the court if and when the question is presented. "Whether acts of interference with easements or the uses thereof constitute a violation of the rights of the parties is a matter for future determination of a court when the particular acts are presented to it for determination. [Citation.]" (*Sufficool* v. *Duncan* (1960) 187 Cal.App.2d 544, 550 [9 Cal.Rptr. 763].) (See *O'Banion* v. *Borba* (1948) 32 Cal.2d 145, 155 [195 P.2d 10].)

Passing to a consideration of the easement by necessity (E-D, Appendix 1) created by the judgment across the northerly 15 feet of the Torosian property, the case of *Reese* v. *Borghi* (1963) 216 Cal.App.2d 324, 332-333 [30 Cal.Rptr. 868] (per Sullivan, J.), defines the minimum conditions required for the creation of an easement by necessity: "The California rule is settled that a right-of-way of necessity arises by operation of law when it is established that (1) there is a strict necessity for the right-of-way as when the claimants' property is landlocked [citations] and (2) the dominant and servient tenements were under the same ownership at the time of the conveyance giving rise to the necessity. [Citations.]" (Fn. omitted.)

■ Thus, in California a right of way from necessity cannot exist in the absence of "strict necessity."[2] (*Corea* v. *Higuera* (1908) 153 Cal. 451

---

[2]As was said in the very early California case of *Kripp* v. *Curtis* (1886) 71 Cal. 62, 65 [11 P. 879], and consistently followed since that date: "The right of way from necessity must be in fact what the term naturally imports, and cannot exist except

454 [95 P. 882]; *Marin County Hospital Dist.* v. *Cicurel* (1957) 154 Cal. App.2d 294, 302 [316 P.2d 32]; 3 Miller & Starr, Current Law of Cal. Real Estate, § 735.)

Cases relied upon by Boydstuns that only reasonable necessity need be shown and therefore the limitations on the Boydstun easement are such as to justify the creation of an easement by necessity across the Torosian property are inapposite inasmuch as they pertain to the creation of easements by implication rather than easements by necessity. ■ It is true that only reasonable necessity need be shown to create an easement by implication, but the cases clearly distinguish between the two types of easements. (*Reese* v. *Borghi* (1963) 216 Cal.App.2d 324, 331-332 [30 Cal.Rptr. 868]; 3 Miller & Starr, Current Law of Cal. Real Estate, §§ 729, 735.) The court in the case at bench found against the creation of an easement by implication.

■ Inasmuch as the Pipkins had access to their property over the Boydstun easement (A-B, Appendix 1), though limited in scope and purpose, a strict necessity did not exist; accordingly, as a matter of law no right of way by necessity could have arisen over the Torosian property giving Pipkins access to Temperance Avenue.

The judgment is reversed insofar as it creates an easement by necessity (E-D, Appendix 1) in favor of the Pipkins over the Torosian property; with respect to the prescriptive easement over the Boydstun property (A-B, Appendix 1), the cause is remanded to the trial court with directions to modify the findings and judgment to provide that the Pipkins have an easement of ingress and egress across the westerly 30 feet of said property of defendants Freddie D. Boydstun, Barbara Ann Boydstun, F. E. Duncan and Gertrude N. Duncan for the purpose of passing and repassing over the same to East Kings Canyon Road by foot, by automobile, by truck, by tractor and by all types of agricultural equipment, provided that the nature, scope and extent of the use does not substantially increase the burden placed upon the servient tenement as it existed during the period that the prescriptive easement was acquired.

Gargano, J., and Ginsburg, J.,* concurred.

---

in cases of strict necessity. It will not exist where a man can get to his property through his own land. That the way over his own land is too steep or too narrow, or that other and like difficulties exist, does not alter the case, and it is only where there is no way through his own land that a grantee can claim a right over that of his grantor. It must also appear that the grantee has no other way. [Citation.]"

*Assigned by the Chairman of the Judicial Council.

APPENDIX 1

A-B Boydstun Easement
B-C Granted Easement
D-E Torosian Easement