## JOHN A. LAY v. JOHN M. NEVILLE.

25  545
f127  295
25  545
e137  685

COMPLAINT.—An allegation in the complaint, of the place where the property was taken, in an action to recover possession of personal property, is surplusage.

DENIAL IN ANSWER.—Where the complaint avers that the defendant wrongfully and unlawfully took and carried away personal property, and the answer denies that defendant wrongfully and unlawfully took and carried it away, it is a confession of the taking and carrying away, and a denial merely of its wrongful character.

SHERIFF'S BILL OF SALE.—A Sheriff's bill of sale of personal property sold on execution need not contain all the formalities of a regular certificate.

SHERIFF'S SALE OF PERSONAL PROPERTY.—When a Sheriff sells personal property on an execution, where he has no authority to do so, if the execution defendant is

present and consents to the sale being made, the purchaser will acquire a good title as against the defendant in the execution.

SALE OF PERSONAL PROPERTY.—The acts required to prevent a sale of personal property from being declared fraudulent for want of an immediate delivery and actual and continued change of possession, depend very much on the character and quantity of the property sold.

PROOF OF BOUNDARY LINE OF A COUNTY.—The boundary line of a county cannot be proved by evidence showing where it is reputed to run among persons living near the line, except where it is an ancient boundary and depends upon prescription, or cannot be proved except by parol.

SAME.—Where a boundary line of a county can be proved by reputation, the proof must be confined to the declarations of persons having knowledge of the matter, and who are since deceased.

APPEAL from the District Court, Seventh Judicial District, Solano County.

On the 24th day of September, 1861, A. Y. Easterby recovered judgment in the District Court for Napa County, against James Glassford, for five thousand seven hundred dollars and ninety-nine cents, and an execution was issued thereon and placed in the hands of J. S. Stark, the Sheriff of Napa County, who levied on, and on the 4th day of October, 1861, sold to plaintiff, Lay, at Glassford's ranch, two thousand and eleven sacks of wheat. There was some doubt as to whether Glassford's ranch was in Napa County, and on the day of sale Glassford consented to the same.

On the 5th day of October, 1861, and before Lay had removed all the wheat from Glassford's ranch, Lewis and Merchant commenced an action against Glassford in the District Court of Solano County, and placed the same in the hands of defendant, Neville, who was Sheriff of Solano County, who, on the same day, at Glassford's ranch, levied on five hundred sacks of the same wheat.

It was to recover this wheat or its value that this action was brought.

Lay claimed title under the sale made by the Sheriff of Napa, and claimed that the ranch was in Napa County, while defendant, Neville, claimed that it was in Solano County.

The following is the certificate of purchase executed to plaintiff by the Sheriff of Napa:

" *District Court, Seventh Judicial District, Napa County.*

" A. Y. EASTERBY ⎫
*v.*                      ⎬
" J. GLASSFORD.    ⎭

" I have sold this day to John Lay, at public sale, on execution in the above cause, two thousand and eleven sacks of wheat, lying at the ranch of Glassford, for and in consideration of the sum of three thousand and sixty-two dollars and five cents, the receipt whereof is hereby acknowledged.

" NAPA, October 4, 1861.

"J. S. STARK, Sheriff Napa County.

" Per J. H. WATERSON, Under Sheriff."

*Whitman & Wells*, for Appellant.

This is one of the cases that form an exception to the rule respecting hearsay testimony, and, being on a question of public right, is well established—so well established, it has been said, " that Judges, the most fastidious in regard to this kind of evidence, do not pretend to dispute its competency, however widely they may differ on its force and effect." (*Per* Lord Ellenborough, C. J.; *Weeks* v. *Sparke*, 1 Maule & Selwyn, 686-7.)

It may, therefore, be taken as settled that when the boundary concerns the extent of a public municipal jurisdiction, as whether lands lie or rights are exercisable within its true limits, either public reputation or the particular declarations of deceased persons, made *ante litem mitum*, are receivable." (*Nichols* v. *Parker*, 14 East. 331, note—cited in 1 Cowen & Hill's Notes, Note 186, p. 241.)

So, in a case cited in the note above quoted, the question being whether a turnpike was within or without the limits of a certain town, evidence was permitted to be given by the party claiming it as within, to show general reputation that the town extended to a piece of land, and that old people, since deceased, said such was the boundary of the town.

And, on trying the validity of a distress for a poor rate, by

magistrates, on land claimed as a part of the parish of B., to determine whether it lay there, descriptions in ancient leases, granted by the ancestors of plaintiff's landlord, and old rates made by the parish officers of B. on the occupiers of the land, and deceased overseers' accounts, crossing out the tax of the occupier, were all received as evidence of reputation on the question of public boundary. (Same Note above cited ; *Plaxton* v. *Dall*, 10 Barn. & Cress. 17.)

" So, in another case, orders of Justices, describing Nottingham Castle as being in the Hundred of B., and evidence that it had long been reputed to be in that hundred was received, to show that it belonged to that hundred, and an extract from Domesday Book was received to repel that presumption."

The authority cited for the last quotation—in the note above referred to—is *Duke of Newcastle* v. *Broxton*, 6 Barn. & Adolphus, 273.

These, like the case at bar, presented cases where the matter in controversy was of public and general interest, but the principle does not require that the right should be public in a literal sense, but rather that it should be general, and such as concerns a multitude of persons ; (1 Phillips on Evidence, 238, 239 ; 1 Greenleaf on Evidence, Secs. 128, 145 ; *Boardman* v. *Reed*, 6 Peters, 328 ; *Conn et al.* v. *Penn et al.* 1 Pet. C. C. Rep. 496 ; *Doe & Taylor* v. *Roe et al.*, 4 Hawks, 116 ; *Ralston* v. *Miller*, 3 Randolph, 44, wherein it is said, as cited in Greenleaf, that ancient reputation and possession were entitled to infinitely more respect in deciding upon the boundaries there in question than any experimental survey.)

*P. W. S. Rayle*, for Respondent.

The vital mistake, amounting to a fundamental error, appellant falls into, is in urging and presenting his case as if it were a contest between the Counties of Napa and Solano, and as though Napa is estopped from asserting her right to exercise jurisdiction in the disputed territory, when, in fact, the respective counties had no more interest in or connection with the

subject matter of litigation in this action than the State of New York or Massachusetts.

In order to show the absurdity of allowing general reputation of a county line to be given in evidence we will refer the Court to the fact that the boundary line of Napa County has been twice changed by the Legislature since it was fixed in eighteen hundred and fifty.

By the Court, Rhodes, J.

This action was brought to recover the possession of five hundred sacks of wheat, which were attached by the defendant, as the Sheriff of Solano County. The complaint states that the wheat was taken possession of by the defendant, at Glassford Ranch, in Napa County, and the defendant denies that he took possession of it in Napa County. The allegation of the place where the property was taken is mere surplusage, and the issue formed upon it is immaterial. The plaintiff has not alleged directly that he was the owner of the wheat when it was taken by the defendant, or at any other time, but the defendant has not taken an objection to the complaint on that ground, and perhaps it can be held that the averment is argumentatively made; at least the defendant seems to so understand the meaning of the allegations of the complaint, for he denies that the plaintiff is the owner of the wheat. The complaint does not state that the defendant detains the wheat, but alleges that he refuses to deliver it to the plaintiff on his demand. The defendant makes no objection to the complaint for that reason, and both parties have treated the case, as an action to recover the possession of the personal property of the plaintiff that was then wrongfully detained by the defendant, or the value thereof, and we shall consider the case as an action of that character.

The defendant denies that he at any time or place "wrongfully and unlawfully took, became possessed of and conveyed into Solano County the personal property of the plaintiff as in complaint alleged." This is intended as a denial of the plain-

tiff's allegation that the defendant wrongfully and unlawfully took, became possessed of and conveyed into Solano County, the property of the plaintiff, but it strictly amounts to no more than a denial that those acts were wrongfully done; but the plaintiff made no objection to that style of denial, and in view of the extreme liberality with which each party has treated his adversary's pleadings, we would be justified in construing the word *and* to signify *or*, wherever it occurs in that denial of the defendant.

The defendant justifies the seizure of the property under an attachment and an execution, issued at the suits of creditors of Glassford, and alleges that the wheat was Glassford's property, and was then in Solano County.

The jury found that the plaintiff was entitled to the possession of the property in controversy, and found the value thereof; and the defendant appeals from the judgment and the order denying his motion for a new trial.

Three principal questions have been argued by counsel: First, whether the plaintiff was, as between himself and Glassford, the owner of the wheat; Second, whether there had been such an immediate delivery and actual and continued change of possession of the property as would satisfy the requirements of the Statute of Frauds; and Third, whether the property at the time of its seizure was in Napa or in Solano County.

1. A. Y. Easterby had recovered a judgment against Glassford in the District Court for Napa County, upon which an execution issued to the Sheriff of that county, and under the execution, the Sheriff levied upon a large parcel of wheat, as the property of Glassford, on the 25th day of September, 1861, and on the 4th day of October, 1861, sold to the plaintiff two thousand and eleven sacks of said wheat, the same being then on Glassford's ranch. At the time of the sale there was some question about the right to the property, and as to its being in Napa County. The Sheriff asked Glassford if he should proceed with the sale, and he answered in the affirmative, and consented to the sale being made. The wheat was

Lay *v.* Neville.

bid off by the plaintiff, who forthwith paid the purchase money to the Sheriff, and the Sheriff then gave the plaintiff a bill of sale, and directed him to take possession, which he immediately did and placed the same in charge of a person as his agent and keeper.   Glassford was present during all these transactions and made no objection to the proceedings, then nor since that time, so far as the record shows.   The purchase money was applied toward the satisfaction of the execution in the case of *Easterby* v. *Glassford*.   There is no valid objection to the bill of sale executed to the plaintiff by the Sheriff.   It is not in form a certificate of sale, but it contains all the essentials of a certificate, it lacking the mere formal statement, " I do hereby certify," etc.   The sale was sufficiently proven without the bill of sale, and its introduction was unnecessary, but not erroneous.

If the Sheriff, in fact, had no authority, as Sheriff, to sell; and if, upon doubt being expressed, the execution defendant directed the Sheriff to sell, or consented to his proceeding with the sale, which was thereupon made, and the price was paid and possession of the property given to the purchaser, as in this case, the execution defendant would be estopped from asserting title to the property; for, relying upon such consent to the sale, the purchaser has parted with his money and the execution defendant has received the benefit of it.   If the Sheriff had no authority by law to sell, and for that reason it should be held that his sale as Sheriff, under his execution, was void—and it is not necessary to say that Glassford's consent could vest him with authority, as a Sheriff, to sell—then the sale would be upheld, as any other sale made under the direction of the owner of the property sold, or a sale made by a third person, in the presence of the owner, by his consent, or with his acquiescence.

The Sheriff would be regarded as the agent—the auctioneer —of the owner, and the owner would be bound by his acts done in pursuance of his authority as such agent; and as between the owner and the purchaser, the sale would stand as if made by the owner without the intervention of the Sheriff.

As between Glassford and the plaintiff, the sale was complete and valid. (Story on Agency, Secs. 90–93 ; Dunlap's Paley's Agency, 171.)

2. At the time of the sale, the wheat was in the field of Glassford, in the possession of the Sheriff's keeper ; and the Sheriff, upon receiving the amount of the plaintiff's bid, delivered the grain to the plaintiff, who thereupon put Preston in charge as his keeper, who remained in charge a short time, and on leaving placed the grain in the care of O'Niel, who kept control of that which was left on the ranch, until it was taken by the defendant. The plaintiff without delay procured six to eight teams, and engaged them in hauling the wheat from the ranch of Glassford ; and on the fifth of·October, when the defendant attached five hundred sacks of the grain, the plaintiff had removed the larger part of the grain, and was then removing the remainder. It is not intended by the fifteenth section of the Statute of Frauds, to make a sale void, as against the creditors and purchasers of the vendor, unless the vendee shall perform in every case, what might in some cases be an impossibility. It was intended that the vendee should immediately take and continuously hold the possession of the goods purchased, in the manner and accompanied with such plain and unmistakable acts of possession, control and ownership, as a prudent *bona fide* purchaser would do, in the exercise of his rights over the property, so that all persons might have notice, that he owned and had·possession of the property. The acts that will constitute a delivery, will vary in the different classes of cases, and will depend very much upon the character and quantity of the property sold, as well as the circumstances of each particular case. The same acts are not necessary to make a good delivery of a ponderous article, like a block of granite or a stack of hay, as would be required in case of an article of small bulk, as a parcel of bullion. It might properly be required, that there should be a manual delivery of a single sack of grain at the moment of its sale, but upon the sale of two thousand sacks, this could not be done without incurring great and unnecessary expense, and

departing from the usual course of business. The same is true of the acts that may be requisite to manifest the actual and continued change of possession required by the statute. Each case must, in a great manner, depend upon its own circumstances. This is well illustrated in the case of *Chaffin* v. *Doub*, 14 Cal. 384. The property mortgaged consisted of hay lying in swaths, winrows and stacks, over three large fields of the mortgagor, and the possession of it had been given by constructive delivery to the mortgagees, who from thence continued to work on the hay during eight days, when it was attached for the vendor's debts. The Court held that, " if an actual and immediate delivery were construed to mean a removal immediately from the premises, the requirement of the statute in such cases would be impossible of performance," and that time was necessarily required to gather and remove the hay. (See, also, *Pacheco* v. *Hunsacker*, 14 Cal. 120.) In this case, all the acts were done that could be reasonably required on the part of the vendor, to effect an immediate delivery of the property sold, and the acts of the purchaser in taking and keeping possession, and diligently proceeding and continuing to remove the grain from the premises, were sufficient to satisfy the requirements of the statute.

2. The Act of eighteen hundred and fifty-five, defining the boundaries of Napa County, describes the southern boundary as follows : " Commencing at a point in Guichica Creek where the said creek empties into San Pablo Bay ; thence running in a direct line due east to the top of the mountains dividing Napa Valley from Suisun Valley." The initial point in the line is where the middle of the stream of the creek meets the line of San Pablo Bay. A competent surveyor, and perhaps any other person, could find that point ; and when that point has been ascertained the line must run thence due east to the " top of the mountains," no question being made that the line thus run will strike the mountains. Previous to the Act of eighteen hundred and fifty-five, the southern boundary of Napa County was further to the north, and that line coincided with the northern boundary of Solano

70

County; and it is understood that the southern boundary of Napa County and the northern boundary of Solano County still coincide; for though not expressly so declared in the Act, yet as a portion of Solano was added to Napa, the two counties would be held to be bounded by each other.

The defendant offered to prove the southern boundary of Napa County, by evidence of general reputation among persons living near the line in question and in other parts of the counties. The evidence was excluded, and the defendant having taken his exception, now complains of the ruling of the Court in that respect. Some of the objections to the defendant's being permitted to prove the boundary in that manner may be stated, but the ground has been so fully occupied in the numerous and carefully considered opinions of the Courts, and by the text writers, that it is quite unnecessary to discuss them in detail. This boundary is not in any sense an ancient boundary. It was not proposed to prove an accurate or a defined line on the land—a line indicated by any locative calls or visible landmarks—but simply where the line was *reputed* to be. The only point that could by any possibility serve to determine the position of the line was the initial point, and when that point was ascertained no amount of testimony of any character could make the line from that point vary from true east. It was competent for the defendant as well as the plaintiff to prove by general reputation which of two or more streams in 1855 was known as Guichica Creek, or where was the line of San Pablo Bay, so as to ascertain the initial point as declared by the Legislature; but general reputation was not admissible to show where a line, commencing at the point thus ascertained and running east, was, or would be. This species of evidence is admissible only "from the nature and necessity of the case," as where the bounds depend upon prescription, or cannot be proven to have existed except by parol; but where better evidence exists it must be produced.

The party offering in evidence reputation to prove ancient boundaries, must confine his proof to the declarations of persons having competent knowledge of the matter in contro-

versy, and who are since deceased. This species of evidence is very properly denominated traditionary evidence. (1 Greenl. Ev., secs. 130, 145, and notes; 1 Phil. Ev., Cowen, Hill & Edwards' Notes, 218, and note 87.)

The evidence that persons living in the disputed territory voted, were assessed, and paid taxes in either county, and that officers of either county served process there, might show where they believed the line to be, but it was not competent proof of where the line actually was.

It is not necessary for the purposes of this action to determine whether the survey and map made under the direction of the Surveyor-General are authoritative and conclusive; but the testimony of De Woody, the County Surveyor of Napa County, who assisted in the survey and knew where the initial point was, was competent evidence to show whether the line running east from that point included the Glassford Ranch in Napa County. The testimony of the County Surveyor of Solano County, who knew the initial point but had not run the line, was admitted, and the jury doubtless gave the greater weight to the testimony of De Woody. D'Hemacourt did not know the initial point, and his testimony as to the position of the line, relative to Glassford's ranch, was properly excluded. The testimony of Wells, if it had been admitted, would, at best, have been but secondary evidence.

The instructions are substantially correct.

Judgment affirmed.