[Civ. No. 39123. First Dist., Div. One. Mar. 23, 1977.]

HOWARD J. JORDAN et al., Plaintiffs and Respondents, v.
RICHARD J. WORTHEN et al., Defendants and Appellants.

COUNSEL

Robert A. Fowler for Defendants and Appellants.

Leo M. Cook for Plaintiffs and Respondents.

## OPINION

**SIMS, J.**—Defendant Richard J. Worthen and defendant Owens, Jr., are the owners of two of several parcels subject to an easement for a private road leading to a former ranch. Plaintiffs are the owners of the parcels created by a subdivision of that ranch. Defendants have appealed from a judgment which granted the plaintiffs injunctive relief against any obstruction of the road by defendant Worthen, and quieted plaintiffs' title to an easement and right of way over the road in question against defendant Worthen and his wife, against Owens, Jr. and against one Beebe, a defaulting defendant.

The appealing defendants contend that the subdivision of the property now owned by plaintiffs was not reasonably foreseeable, and that their use of the road substantially overburdens the prescriptive easement established by their predecessor in title. They also assert that the trial court erred in admitting reputation evidence concerning the use of the road. These contentions are examined and found to be without merit. The trial court applied the correct legal principles and there is substantial evidence to support its findings of fact and conclusions of law. If there was error in the admission of evidence it was not prejudicial. The judgment must be affirmed.

The road, referred to as "The Top of the Hill Road" or "Bill Owens Road," is located in Mendocino County about three miles south of Point Arena on State Highway 1. It runs easterly in an irregular manner one and one-half miles through the property of the defendants to the property now owned by the plaintiffs, which prior to its subdivision in 1968 was a 320-acre ranch known as the Comegys' property. It was used for ingress and egress to that ranch, and at times by the owners of property beyond, for many years, extending back into the latter part of the nineteenth century. In 1962 defendant Worthen acquired his 40-acre parcel which was part of a 200-acre holding which was divided into other parcels held by the defendant Hope Worthen (not a party to this appeal), Helen and Frank Ludgren (not parties to this action), and the defendant William Owens, Jr.

In 1963 Worthen put a locked chain across the road at the westerly end of his property and gave a key to a member of the Comegys family who had consented to the obstruction. He also allowed the prior users from the property beyond to continue their use. In 1965 the Comegys' ranch passed to one Zettler who in 1968 commenced dividing the property by sales of parcels to the plaintiffs. A final approved parcel map of nine parcels, indicating it complied with a prior approved tentative map, was filed December 10, 1974, with the county recorder. It shows access roads to the east to Ten Mile Road, a county maintained road, and to the southeast to Schooner Gulch Road, another publicly maintained road. Zettler used the key which he had apparently secured from his predecessor. When he approached Worthen about making the road a county road, Worthen advised him he was not interested and wanted his privacy and isolation. Plaintiffs Koepernik testified that there was no chain across the road when they viewed the property on several occasions in the spring of 1968 before they purchased it that summer. Later that year they found a chain there. According to Worthen, he let them through once, but told them that he did not consider that the road would be available to the people buying parcels of the original ranch. During Easter week in 1969 after the chain had been up, according to Worthen, five years and ten months, it was found cut and on the ground with the padlock intact. Worthen restored the chain that summer, but it was cut within two or three months. A third chain was removed shortly after it was put up. In 1971 Worthen's house was burglarized. Thereafter he put up locked gates across the road at the southwesterly end of his property, and to the northeasterly end where his property abutted on the former Comegys' ranch. According to Jordan, who in the fall of 1973 purchased the parcel on which the old Comegys' home stands from

Koepernik, the gates were up at that time. The caretaker for plaintiff Adebonojo testified that there was free access to the property over the road in 1970, and he went in and out from November 1970 until April 1971 while he was erecting a house on the property. When he returned in 1973, he found the gates up and was told by Worthen he could not use the Top of the Hill Road. He refrained from using it until the Schooner Gulch Road washed out in February 1974. This action was filed March 4, 1974, and as a result of a pendente lite order the plaintiffs Jordan and Adebonojo were given keys to Worthen's gates and permitted to use the road. Other facts are referred to below.

## I

The plaintiff called as a witness a superior court judge who had been on the Mendocino coast on and off for all of the 54 years of his life. He described the road as it appeared in his youth and the years before World War II when he traveled it in a car and on horseback. In the 1950's he used the road, when, as a lawyer, he was investigating a case of timber trespass for the owners of property northerly of the Comegys' ranch. He was then asked if he had investigated the history of the road in connection with that litigation. The witness replied that he had discussed it with a former justice of the peace who had died in 1965 in his late seventies or eighties, after having lived his entire life in the area, and that he had secured affidavits from that informant on the historic use of the road. Over the defendants' objection the witness was permitted to testify that the decedent had told him that in the early 1900's or late 1800's the road had been used for transporting redwood railroad ties from the general area of Comegys' down westerly to the coastal road.

Plaintiff Jordan testified that he had talked to old timers around the area with respect to the history and community reputation of the Top of the Hill Road. His informants included a 76-year-old lifetime resident who had already testified that in 1904 or 1905 his father bought 160 acres, from which the 40 acres of plaintiff Worthen were carved. That witness testified that his father had men in there cutting railroad ties, and that he was familiar with the road which was then known as the road to Comegys' and was unobstructed except for unlocked cattle gates. He also stated that the Comegys hauled packed apples, and timber products, consisting of ties, split posts and cordwood, over the road, and that except for products of the west 40 acres, his father's timber products were hauled out over Schooner Gulch Road.

Jordan's other informants included one Beebe, who lived at the entrance to the road. As a witness for the defendants, Beebe testified that he was born there in 1910 and lived there all his life except for 16 years spent in the East Bay. He testified that most of the wood products from Comegys' went out another road, although some were hauled over the road in question. Jordan also talked to the 70-year-old Point Arena Constable and another man on the subject of the road. Over objection the court permitted Jordan to testify as to what he had learned about the history and community reputation of the road. He testified, "Generally the attitude that I have understood from the old timers I have spoken to is that this road has been there forever, and it has no reason for having the gates across it. That is basically it."

He was then asked, "As far as the general history or reputation of the road is concerned, is there any history or reputation as to what people went to the Comegy property, for what purposes they had in going to the Comegy property in ancient or old days?" Over objection, he was permitted to state: " . . . I was told by Mr. Joe Holliday of Point Arena that he used to go and buy eggs and produce from Mrs. Comegy. [¶] Other people have made reference about it, but he is the one I could probably quote accurately about it . . . ."

Section 1320 of the Evidence Code provides, "Evidence of reputation in a community is not made inadmissible by the hearsay rule if the reputation concerns an event of general history of the community or of the state or nation of which the community is a part and the event was of importance to the community." (See Witkin, Cal. Evidence (2d ed. 1966) § 619, pp. 583-584.)

Section 1322 states: "Evidence of reputation in a community is not made inadmissible by the hearsay rule if the reputation concerns boundaries of, or customs affecting, land in the community and the reputation arose before controversy."

■ Plaintiffs' reliance upon the foregoing rules is of questionable applicability. The second extract of the testimony of the witness Jordan is pure unadulterated hearsay. Whether Mr. Holliday used to go and buy eggs and produce can scarcely be termed "an event of general history of the community . . . of which the community is a part" or an "event of importance to the community." Nor can either the witness' testimony or the declarant's statement be considered evidence that there was a

reputation in the community ·that the Comegys' land was customarily used for the sale of eggs or produce.

Jordan's testimony concerning the attitude of old timers, bears some semblance to establishing a reputation that the road was there "forever." That fact is conceded, and it is unnecessary to pursue the question of whether there is compliance with other elements of the above sections.

■ The judge's testimony concerning his informant's declaration that the road was used for the purpose of transporting ties would appear to be pure hearsay. There may be some semblance of propriety since the witness was in fact dead. (See *Lay* v. *Neville* (1864) 25 Cal. 545, 554-555.)

■ In any event the use of reputation evidence, if such the above may be called, is of doubtful validity where private rights are concerned. In *Simons* v. *Inyo Cerro Gordo Co.* (1920) 48 Cal.App. 524 [192 P. 144], the court pointed out that "the general rule is that evidence of common reputation of ownership is inadmissible, under the code as at common law, where private property rights only are affected and matters of general or public interest are not involved, . . ." The court had already indicated such a rule was required because "to hold that, where title is a direct issue and· is of such a character that a claim thereto can in nowise affect the public or its interests, evidence of common reputation of ownership is admissible, would countenance a rule that easily could be turned to the accomplishment of great wrong and injustice, and titles would be won and lost as neighborhood gossip veered with the ever-changing feelings of friendliness. or hostility toward the rightful claimant." (48 Cal.App. at p. 532. See also *Berniaud* v. *Beecher* (1888) 76 Cal. 394 [18 P. 598]; and *Lay* v. *Neville, supra,* 25 Cal. 545, 554.) Moreover in *Shepherd* v. *Turner* (1900) 129 Cal. 530 [62 P. 106], the court squarely ruled, in upholding the exclusion of evidence, "While it was competent to prove the use made of the road and the extent of the use, for the purpose of showing that it had become a public way by dedication, or adverse user under a claim of right, it was not competent to prove such user by the declarations of third parties. Neither was hearsay evidence admissible to prove such fact. A public highway cannot be proven by showing that it was generally reputed to be a highway." (129 Cal.App. at pp. 535-536.)

■ The plaintiffs also suggest that admission of the foregoing hearsay was proper because a court may take judicial notice of matters of local knowledge, and in taking such notice the court is free to consult any

sources. The subject of the nature of the past use of the road to Comegys' is not a fact or proposition of generalized knowledge that is so universally known that it cannot reasonably be the subject of dispute. (Cf. Evid. Code, § 451, subd. (f); and see Witkin, *op. cit.,* § 175, pp. 161-162.) It possibly could be a fact or proposition of such common knowledge within the territorial jurisdiction of the court that it could not reasonably be the subject of dispute. (Evid. Code, § 452, subd. (g); *Mogle* v. *Moore* (1940) 16 Cal.2d 1, 4 [104 P.2d 785]; and see Witkin, *op. cit.,* § 176, pp. 162-163.) Evidence Code section 454 does provide in pertinent part, "(a) In determining the propriety of taking judicial notice of a matter, or the tenor thereof; [¶] (1) Any source of pertinent information, including the advice of persons learned in the subject matter, may be consulted or used, whether or not furnished by a party. [¶] (2) Exclusionary rules of evidence do not apply except for Section 352 and the rules of privilege . . . ." (See Witkin, *op. cit.,* § 185, p. 169.) Nevertheless, in this case there was nothing to establish that the historical use of the road to Comegys' was a matter of common knowledge, and the declarations of others which were testified to by the witnesses were the declarants' individual observations, not common knowledge.

■ Although the court erred in overruling the defendants' objections we cannot find prejudice, resulting in a miscarriage of justice. (Cal. Const., art. VI, § 13; and Evid. Code, § 353.) The testimony of the elderly witness and the younger judge concerning their own observations serve to sustain the material findings of the court as reviewed below.

## II

■ One who claims a prescriptive right to an easement in a private roadway over another's property has the burden of proof to prove all of the essential elements necessary to establish such a right of way. (*O'Dea* v. *County of San Mateo* (1956) 139 Cal.App.2d 659, 661 [294 P.2d 171]; *Bartholomew* v. *Staheli* (1948) 86 Cal.App.2d 844, 849-850 [195 P.2d 824].) In this case there is no question that a right of way to the Comegys' ranch existed at all times up to the time Worthen put his chain across the road. He thereafter acknowledged the right of the owners of the Comegys' ranch to use the road by unconditionally giving them a key. It was only in 1968 that he refused passage, and then on the ground that the right to use the road could not be apportioned with the ranch property. However, as the court noted in its findings of facts and conclusions of law, the chain was not maintained adversely for the prescriptive period,

and this action was commenced before such period could run with respect to the gates. The real issue is whether the burden on the defendants' property may be increased by the division of the ranch land.

The trial court found, after setting forth the descriptions of the eight parcels owned by plaintiffs and a general description of the road, as follows:

"10. The aforesaid road has always been in the same location and crosses the property of defendants.

"11. From a historical standpoint, the properties over which the road runs in Sections 29, 28 and 21, and which were reached and served by the road were originally family farming units between 160 and 320 acres in size originally covered with stands of coastal redwood trees and some fir which were developed by the owners for the production of wood forest products such as railroad ties and split products before and around the turn of the century (1900) and up to World War I, together with the growing of fruit trees, family gardens and the raising of sheep and some cattle. In such connection the road in issue was used for ingress and egress to a 320 acre tract described as the Comegy ranch of which the plaintiffs are now the owners of portions. This ranch was operated by the Comegys at least from the early 1900's on as a family home ranch producing forest wood products and with an orchard and live stock. There was a principal ranch house on this property which was occupied by the Comegy family and which is still in existence and within the parcel which is now owned and occupied by Mary and William Jordan and their children and the road was used by the Comegy family for access to such family ranch home together with agricultural stock and timber forest products, production and removal (some forest products were removed over another road not now in existence). The road was also used for access to one or more ranches beyond the Comegy ranch as well as the property of the defendants predecessors and considerable wood forest products were removed over the road.

"12. Over the years since the 1940's, the entire area involved in the present litigation together with the lands adjoining it and in the general Point Arena and South Mendocino Coast area have followed a pattern of division into smaller parcels and a change from the original family farms to use as recreational areas with 'second homes or retirement homes,' and consequently increases in population and the number of people in vehicles using the available roads, including the road in question, and

the type of use of such roads. The current use being no longer commercial for the transportation of forest wood products as all the available timber has been cut and recut and now none remains to be removed with the remaining trees of value for their beauty and enhancement of the recreational value of the property and with the family farms no longer in existence but the roads are used for access to and from the properties by the persons owning the same for recreational, second home and retirement home purposes. This is particularly true of both the plaintiffs and the defendants RICHARD J. WORTHEN, HOPE BICKFORD WORTHEN and WILLIAM O. OWENS, JR. who have constructed second homes for recreational purposes on their properties with plans for ultimate retirement thereto. Similar homes have been erected on several parcels of the plaintiffs' land including those of plaintiffs' FESTUS O. ADEBONOJO and MARY B. ADEBONOJO.

"13. At present there is no effective alternative access by plaintiffs to their property other than over the road in question. Their predecessors ZETTLER did construct an alternate access road however it was not built to county specifications, is presently impassable, and even if placed in an operating condition would require plaintiffs to travel a considerable longer distance to reach the nearest community of Point Arena and take a considerable longer period of time. The defendants RICHARD J. WORTHEN and HOPE BICKFORD WORTHEN installed permanent gates across the road where it entered and left their property claiming the right to block the road completely and only allow those persons to whom they gave permission to use the road. These gates were in existence for less than five (5) years before the present suit was filed. The gates serve no useful purpose, and were only placed by the defendants WORTHEN in order to block the use of the road by plaintiffs. (The original Comegy ownership had installed the gate on its side of the ranch line across the road for the purpose of keeping stock within the ranch. The use of this gate had been abandoned when the Comegy ranch ceased to be used for stock purposes, probably before 1950.)"

Plaintiffs assert that the judgment must be affirmed because the defendants have failed to show that the foregoing findings are not sustained by the evidence. ■ " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 . . . [other citation omitted].) [¶] 'It is well established that a

reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' (*Tesseyman* v. *Fisher* (1952) 113 Cal.App.2d 404, 407 . . . ; [other citations omitted].) Defendants' contention herein 'requires defendants to demonstrate that there is *no* substantial evidence to support the challenged findings.' (Italics added.) (*Nichols* v. *Mitchell* (1948) 32 Cal.2d 598, 600 . . . [other citations omitted].)" (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]. See also *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Thomas* v. *England* (1886) 71 Cal. 456, 460 [12 P. 491]; *Hill* v. *Allan* (1968) 259 Cal.App.2d 470, 487 [66 Cal.Rptr. 676]; and *Bartholomew* v. *Staheli, supra,* 86 Cal.App.2d 844, 850.)

Except as noted below, the defendants have failed to show that the findings are not supported by the evidence. The ultimate issue is a determination of the principles of law to be applied.

## III

Civil Code section 806 provides, "The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." In *Bartholomew* v. *Staheli, supra,* 86 Cal.App.2d 844, the court elaborated on the foregoing rule as follows: "When an easement is acquired by prescription, the extent of the right is fixed and determined by the manner of use in which it originated. An easement acquired by prescription cannot be extended or increased so as to enlarge the burden except by grant or by adverse user which has been acquiesced in for the required statutory time. One who has acquired an easement by prescription or by grant may not use it to impose a substantial increase or change of burden on the servient tenement. [Citations.]" (86 Cal.App.2d at p. 850. See also 5 Rest., Property (1944) § 477, p. 2992.)

Section 811 of the Civil Code provides in pertinent part: "A servitude is extinguished: . . . [¶] 4. When the servitude was acquired by enjoyment, by disuse thereof by the owner of the servitude for the period prescribed for acquiring title by enjoyment." (See *People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 419 [196 P.2d 570, 6 A.L.R.2d 1179]. Cf. 5 Rest., Property, *supra,* § 504, p. 3076, particularly com. d, example 6, p. 3080, and § 506, p. 3090.)

In reliance on the foregoing principles, the defendants contend that at the time the property was conveyed to Zettler in 1965 the only prescriptive rights remaining were limited to ingress and egress for a single family residence, because, assuming that the road at one time was used for the transportation of forest wood products, livestock, orchard crops, and other farm products, such uses had ceased for many more years than the prescriptive period prior to 1965. The findings of the trial court indicate that in a larger sense the nature of the enjoyment was a right of way or road for the purpose of ingress and egress to the dominant tenement, the Comegys' ranch. In that larger sense there is no evidence of extinguishment by disuse for the statutory period. Nor is there evidence of abandonment by disuse or adverse use by the owners of the servient tenement. ■ ■■■■ The following finding is found among the conclusions of law:[1] "The defendants BEEBE and OWENS took no action at any time to prevent the use of the road by plaintiffs or their predecessors. Defendants WORTHEN took no effectual means to prevent or obstruct the use of the road until the erection of the two gates less than five (5) years before the present action was filed. (The court does not consider the intermittent and somewhat ineffectual placing of the chain across the road for broken periods of time prior to the construction of the gates to have amounted to effectual blocking of the road or obstruction of the rights of the plaintiffs or their predecessors on the part of the WORTHENS.)"

In a narrower sense the court indicated that the road and the prescriptive right thereto was created and used by the owners of the dominant tenement for access to such family ranch home together with the production and removal of agricultural, livestock and timber forest products. (See finding 11, as quoted above.) We do not believe that the failure to use the road for the latter purposes necessarily diminishes the scope of the easement as originally created so long as it was actually used for ingress to and egress from the ranch. (See 5 Rest., Property, *supra*, § 504, com. d, example 6, p. 3080 .) It is unnecessary to decide this question, and apparently will not be necessary to do so in the foreseeable future. The record indicates that the development is for recreational, second home, and retirement home purposes—uses completely incompatible with those original commercial uses. The only materiality of

---

[1]The court expressly concluded: "If any Conclusion of Law expressed herein amounts to a Finding of Fact, it shall be construed as a Finding of Fact." It is generally recognized that a finding of fact may be treated as such although mistakenly placed among the conclusions of law. (4 Witkin, Cal. Procedure (2d ed. 1971) § 323 at p. 3127.)

evaluating the original uses is to determine the extent to which the burdens to the servient tenement are increased.

The defendants acknowledge: "The ultimate criterion in determining the scope of a prescriptive easement is that of avoiding increased burdens upon the servient tenement (*Bartholomew* v. *Staheli* (1948) 86 Cal.App.2d 844 . . . ) while allowing some flexibility in the use of the dominant tenement (*Hill* v. *Allan* (1968) 259 Cal.App.2d 470 . . .)." (*Pipkin* v. *Der Torosian* (1973) 35 Cal.App.3d 722, 729 [111 Cal.Rptr. 46].) They admit that they have to distinguish the two cases. In *Bartholomew* the dominant tenement was operated as a home and farm on which the owners raised crops and grazed cattle at the time the easement was acquired. The use restrained was that by patrons of a nudist colony, of a resort for renting cottages, a public dining room and a store. The decree did provide that the easement was not for resort, commercial, subdivision, or other purposes than traveling to and from their real property as a single family dwelling and farm. (See 86 Cal.App.2d at pp. 847-849.) Nevertheless the question of subdividing for single family use was not presented.

In *Hill*, on the other hand, the court stated: "The crux of the dispute here is whether the use of the easement by 24 additional residences exceeds the general outlines of the prescriptive right acquired by adverse user over the years, as the Allans contend, or whether it is merely a change in the degree of the established use, as the Nielsons contend." (259 Cal.App.2d at p. 485.)

The trial court expressly followed the principles adopted in *Hill* which in turn were predicated upon sections 478 and 479 of the Restatement of Property. It particularly concluded as set forth in the margin.[2]

[2]"III [¶] Following the applicable principals set forth in Sections 478 and 479 of the Restatement of Property as quoted and relied upon as in the case of *Hill* v. *Allan,* 259 C.A.2d 470 in ascertaining whether the use of the road described is permissible, the court has made a comparison between the usage in issue and the use by which the easement was created with respect to the physical character of the road, purposes of the road and the relative burden caused by such use between the servient tenement and the needs which result from a normal evolution by the use of the dominent tenant and the extent to which the satisfaction of those needs increasing the burden of the servient tenements. The use of all land involved in this case including both the lands of the plaintiffs and the defendants is subject to continuous change because of natural forces and human activities and the extent of the easement of use of the road in question which was originally created by prescription cannot be exactly measured by the conditions of the dominant Comegy[s] tenant during the period of prescription which included forest products removal and farm or ranch use. The current and foreseeable usage satisfying new needs are privileged as the conditions requiring them are a natural development in

Insofar as the foregoing conclusions of law embody findings of fact (see fn. 1 above) there must be substantial evidence to support them. Defendants' attack the findings and conclusions on various grounds.

They contend there is no evidence to show that it was reasonably foreseeable that the Comegys' property would be divided into smaller landholdings, or that the Zettler subdivision was a normal development on the Mendocino Coast. Defendants' own witness, who lived at the beginning of the road, acknowledged that the way people live in the country up in the hills behind Point Arena had changed, and that by 1975 the hill land behind Point Arena south, where one can view the ocean, has been divided up into rather small parcels of land for people to have summer homes for recreation mainly, and that such was not only true on the Comegys' place, but on other land back up in that area. In fact the record indicates that in 1962 Worthen himself purchased 40 acres out of a 160-acre parcel that had formerly been in one ownership, and that the defendant Owens, Jr. also had secured through his father 80 acres of the 160-acre parcel. It would appear, therefore, that as early as 1962 the defendants knew of the changing use, and the finding of the court that they knew about it when the gates were erected in 1971 is sustained. The record may suggest that the manner in which Zettler's property originally was actually divided was abnormal, if not illegal, but the fact of division was not, on the record, abnormal for that area.

The assertion that they did not know that Zettler himself would subdivide until after he had acquired the property and requested the

the sense in that in accordance with common experience such development might reasonably have been foretold and are consistent with the pattern of usages under which the right to use the road was originally created.

·"IV

"The court concludes that up to the period of time in which the defendants WORTHEN placed permanent barriers in the form of gates across the road in question that it could be reasonably foreseen and was a natural development that all properties in the area would be divided into smaller landholdings and change from the original family, timber and farm holdings into recreational and second home or retirement home parcels with a difference in usage because of such change and an increase in travel, but of a different type than the historical basis under which the use of the road had evolved. Although the burden of usage on the servient tenements has been, and undoubtedly will be, increased to some extent when plaintiffs' parcels of land, and the other parcels of land within the original Comegy[s] 320 acres are utilized for recreational and second or retirement home purposes, such use represents the highest and best usage of such lands from an economic and social sense and that the evolution to such usage meets the test of reasonable foreseeability under the authorities cited.

"V

"The burden of such different and possibly increased usage of the road by plaintiffs will not prevent the substantial enjoyment by the defendants WORTHEN and OWENS by the use of the properties for recreational, second home and retirement purposes."

defendants to assist in having the road made a county road is irrelevant. The die was already cast. It was the development of the area that carried with it the Comegys' ranch, irrespective of the whim of the owner from time to time. The subsequent efforts to assert rights, adverse to whatever rights might accrue to those taking conveyances of portions of the ranch, were an acknowledgment that such rights would exist if unchecked. The fact that the attempted adverse use—by chains and gates—never continued for the statutory period, leaves the parties to stand on their rights under the law as enunciated in *Hill* v. *Allan.*

The question of the good faith of Zettler is not material. The fact that he paid less for the ranch than he would have if it had been served by a public road, the fact that he requested the defendants to assist in establishing such a public road, and the fact that he constructed a new access road to Schooner Gulch Road to satisfy public authorities, show that he had access problems, but do not add or detract to whatever rights may have flowed from his predecessors in connection with the use of the road involved in this action. In other words, the authority's requirement of public access cannot detract from such private access as may otherwise exist.

In view of the defendants' attempts to interfere with plaintiffs' use of the road they can hardly be heard to complain that the plaintiffs have failed to contribute to the maintenance of the road. It may be assumed that the expenses of the maintenance of the road will be shared as provided by law. (See Civ. Code, § 845.)

The fact that the defendants have placed their properties with others in an agricultural preserve, does not obscure the fact that those parcels were originally carved out of a larger parcel. Although they may have given up the right to subdivide and secure a tax advantage, they cannot thereby detract from what rights the successors in interest of the owners of the ranch, which was concededly served by the road, may have.

■ The claim here is not for an easement by necessity. Therefore, the fact that Zettler has supplied clear title to access to Schooner Gulch Road, and presumably, although questioned, to Ten Mile Road, is not determinative of plaintiffs' rights to succeed to the rights of the former owners of the ranch to ingress and egress over Top of the Hill Road. Nor, by the same token, are the time and distance factors of other routes of access determinative one way or another. Those facts do, as recognized by the trial court, bear on the relative burdens imposed on the dominant

and servient tenements by restriction or expansion of the use of the road, as the case may be. There is evidence to show that neither of the foregoing routes. are feasible because of factors of time, distance, and impassibility of either intermittent or permanent nature.

■ Finally, we note that Civil Code section 807 provides: "In case of partition of the dominant tenement the burden must be apportioned according to the division of the dominant tenement, but not in such a way as to increase the burden upon the servient tenement." Strict application of this rule would limit the right to use the private road to one family, presumably the plaintiffs Jordan, who have acquired the old ranch house. The law, however, is not so unmalleable. The Restatement of Property indicates, "Except as limited by the terms of its transfer, or by the manner or terms of the creation of the easement appurtenant, those who succeed to the possession of each of the parts into which a dominant tenement may be subdivided thereby succeed to the privileges of use of the servient tenement authorized by the easement." (5 Rest., Property, *supra,* § 488, p. 3036.) The rule allowing apportionment has been recognized in this state. (See *Currier* v. *Howes* (1894) 103 Cal. 431, 436 [37 P. 521]; and *Crimmins* v. *Gould* (1957) 149 Cal.App.2d 383, 391 [308 P.2d 786]. Note, Annot., Right of Way—Dominant Tenement (1966) 10 A.L.R.3d 960, 963-968.) It is, of course, recognized, as in section 807, that an undue burden will prevent such apportionment. (See *Russell* v. *Palos Verdes Properties* (1963) 218 Cal.App.2d 754, 755-773 [32 Cal.Rptr. 488]; *Crimmins* v. *Gould, supra,* 149 Cal.App.2d 383, 390-392; and *Bartholomew.* v. *Staheli, supra,* 86 Cal.App.2d 844, 850-853. Note 10 A.L.R.3d, *op. cit.,* at pp. 968-970.) Whether the plaintiffs' use of the private road imposes an unreasonable burden on the defendants is a question of fact. (*Russell* v. *Palos Verdes Properties, supra,* 218 Cal.App.2d 754, 771. See also *Hill* v. *Allan, supra,* 259 Cal.App.2d 470, 487; and *Bartholomew* v. *Staheli, supra,* 86 Cal.App.2d 844, 850.) The evidence which sustains the findings of the trial court on the theory adopted by it, also sustains its findings and conclusions that the burden on the defendants was not unreasonable when weighed under the provisions of section 807.

The defendants express fear that the use by the eight new property owners will lead to unrestrained public use by sightseers, picknickers, and other members of the public using the road to get from the state highway to other public roads lying beyond those roads designed for public access to the subdivision. The situation, on a larger scale, is similar to that found in *Crimmins* v. *Gould, supra.* The trial court

expressly found, "14. It is not true that the said road was a public road (plaintiffs expressly abandoned this contention during the trial of the case) and there was no evidence to support any claim that the road was a public road." The judgment provides, ". . . each plaintiff as the owner of plaintiff's property above described also owns an appurtenant easement and right of way over and upon the road generally known as the Top of the Hill Road or as the 'Bill Owen's Road' [description omitted]." The defendants are enjoined "from in any way obstructing, closing, or interferring [sic] with the use of said road by the plaintiffs, their tenants, invitees, or any other persons having the occasion to lawfully use the said road." There is nothing in the judgment of the trial court or this decision which gives the public rights to traverse the road. If and when the fears of the defendants are realized, the plaintiffs and the defendants will have to cooperate to prevent such use or suffer it. If the plaintiffs refuse to cooperate or foster public use, it may be possible to take appropriate action against them. (See *Crimmins* v. *Gould, supra,* 149 Cal.App.2d 383, 390-393.)

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.