*123 Opinion
ANELLO, J„*
Statement Of The Case
This is an appeal by plaintiffs and cross-defendants and a cross-appeal by defendants and cross-complainants from a judgment by the trial court.
Plaintiffs’ complaint stated four causes of action. In the first cause of action plaintiffs sought declaratory relief of their rights under an easement concerning ingress and egress over a paved driveway (hereafter referred to as the passageway) which existed, in part, on each of two adjoining parcels of real property (hereinafter referred to as Lot 1 and Lot 2). In the second cause of action plaintiffs sought to recover damages for breach of contract to purchase both lots. In the third cause of action plaintiffs sought to recover additional damages because of defendants’ refusal to grant an easement over the above-mentioned passageway. In the fourth cause of action plaintiffs sought specific injunctive relief, predicated upon a separate agreement of the parties.
In addition to defendants filing their answer containing specific and general denials, defendant Lowell Development Corporation filed its cross-complaint, alleging five causes of action, to wit, fraud, fraudulent nondisclosure, negligent misrepresentation, breach of contract and bad faith breach of contract. Plaintiffs’ answer to the cross-complaint contained specific and general denials. It also contained the following affirmative defenses: (1) estoppel, (2) laches, (3) unclean hands, (4) failure/lack of consideration, and (5) that the proximate cause of any damages alleged to have been suffered by defendant Lowell Development Corporation was the acts and/or omissions to act done or not done by defendant.
After a trial without a jury, the trial court filed its memorandum decision which provided that: (1) plaintiffs were awarded an easement on Lot 1, the size of which was smaller than that requested by them; (2) plaintiffs were awarded damages on the second cause of action in the amount of $1,042.19, as and for loss of rents, and $798.50 as and for the expenses of re-leasing and costs; (3) plaintiffs were awarded judgment as *124 to each cause of action in the cross-complaint; and (4) plaintiffs were denied the requested injunction prohibiting the construction on Lot 1. Thereafter, the trial court filed its second memorandum decision in which it adopted the findings proposed by plaintiffs, subject to the following modifications: “The defendants are individually liable. The defendant Lowell A. Noble acted and signed documents as an individual as well as officer of the corporation during portions of the various transactions. [II] The easement was found to be by necessity as well as by reservation, and the description set forth in the memorandum decision by this Court describes the scope and size of the easement. [H] There is no other reasonable or feasible substitute passageway available to the owners and tenants of Lot No. 2. [If] The Court made no finding as to other burdens existing at the time of the acquisition of the land as set forth in Plaintiff’s Proposed Conclusion B. [If] Plaintiff’s retention of $20,000.00 was agreed upon by the parties as consideration for the extension of time. [If] All other findings proposed by defendant acting in pro per or through his attorney are specifically rejected, objections dealing with matters other than that which has heretofore been set forth are specifically overruled and a request for additional findings is denied.”
After the trial court filed its findings of fact and conclusions of law a judgment consistent with the above findings and conclusions was made and entered verba relata inesse videntur.
Defendant Noble filed a notice of intention to move for a new trial which was primarily based allegedly upon new evidence of a Pacific Gas and Electric (PG&E) easement over the lots and its effect on any construction on Lot 1 as contemplated by defendants. After the hearing, the trial court filed its order and notice of denial of motion for a new trial.
On appeal, plaintiffs make the following contentions to support amendment, correction or reversal of the judgment: (1) that the trial court erred in reducing the size of the easement; (2) the trial court erred in failing to give plaintiff injunctive relief as requested; (3) that the trial court erred in failing to render findings of fact and conclusions of law necessary to support portions of the judgment; and (4) that the trial court erred in failing to award plaintiffs certain of the general/special damages prayed.
*125 Defendants Lowell Development Corporation and Charles R. Rittenberry make the following contentions to support reversal or modification of the judgment: (1) that the retention of the $20,000 by plaintiffs was an unenforceable penally and therefore improper; (2) that the trial court’s grant of the easement was improper; and (3) that the trial court’s award of damages was based on improper evidence.
Defendant Noble makes these contentions to support amendment, correction or reversal of the judgment: (1) that buyers’ obligations under the agreements to purchase Lot 2 were subject to a condition precedent which did not occur, and therefore the court’s finding that the buyers were in breach was wrong as a matter of law,and (2) that the trial court’s denial of defendant’s motion for new trial was without reasonable basis and therefore should be reversed.
Statement Of Facts
The plaintiffs were the owners of two contiguous lots, Lot 1 and Lot 2, located in the City of San Mateo. Each lot was a separate legal entity and had its own legal description.
Lot 1 is an unimproved lot. Lot 2 contains a two-story, 12-unit apartment building built in 1929 and known as Casa Hermosa.
The apartment building on Lot 2 contains garages on the street level, which house parking stalls for use by the tenants of the building. The size of the individual parking stalls was consistent with the size of the cars of the 1920’s. Both the trial court and Noble found them to be much too small. Cars entering and leaving the garages drive over a black-topped passageway which overlaps onto Lot 1 in an arc configuration to a maximum radius of approximately 12 feet. This passageway had existed in its present form and dimension since 1930. Its existence and size were known to defendants. Defendant Noble, his agent and his architect, who had made a survey and drawn plans, had personally inspected the area.
In Februaiy 1974, plaintiffs and defendant Lowell Development Corporation entered into two separate agreements for the sale and purchase of Lot 1 and Lot 2. Both agreements expressly provided that, inter alia: (1) each sale was conditional upon the completed sale of the other; (2) both sales were to be completed simultaneously with the other; and (3) both escrows were to close on the same date, i.e., July 1, 1974. Furthermore, the agreement for Lot 1 provided that the purchase was *126 “Subject to Architectural Approval by City of San Mateo of the Preliminaiy Architectural plans”; while the purchase of Lot 2 was subject to the following condition: “Approval of existing building as a condominium by the San Mateo City bureau of planning and adjustments and the San Mateo City council, if necessary.”
The plaintiffs had considered constructing a five-unit apartment building on Lot 1. Preliminaiy plans had been drawn, but they were never formally submitted for city approval. Instead, the plans were turned over to defendants who did not use them but prepared their own plans which called for seven to eight units.
With regard to Lot 2 the defendants sought to gain approval from the applicable San Mateo city agencies for the conversion of the apartment building to a condominium. In addition, defendants hired an engineering firm to prepare the subdivision map, and attorneys to draft the necessary legal documents. The San Mateo Board of Zoning Adjustments (hereafter BOZA) approved the application for the conversion on April 9, 1974.
In the early part of May 1974, it became apparent to defendants that they would not be able to conclude the purchase of Lot 2 due to the refusal of American Savings & Loan (actually First Charter Financial), which was the obligee on an outstanding obligation in excess of $200,000 that existed on Lot 2, to sign the subdivision map which had to be recorded as the final step in the conversion process. American Savings & Loan had “a policy at that time of not approving of subdivision maps to convert apartment houses on which they had loans into condominiums.” Because of this refusal, by early May 1974, defendant Noble had regarded the deal as having “fallen through.”
Nevertheless, on May 11, 1974, defendants signed, and on May 25, 1974, plaintiffs signed an agreement[1] which substantially modified the *127 terms of the February 10, 1974 purchase and sale agreements. Although interpretation of some of the language in this new agreement was disputed, the following undisputed facts emerge: (1) the close of escrow for the purchase of Lot 2 was extended for two months to and including September 1, 1974; (2) the close of escrow on Lot 1 was to be as scheduled, i.e., July l, 1974; (3) the sum of $20,000 was to be “irrevocably disbursed” to plaintiffs by May 24, 1974; (4) the $20,000 disbursement to plaintiffs would be applied to the total purchase price ($300,000) upon close of escrow; (5) no easement on Lot 1 was reserved by plaintiffs for ingress and egress for Lot 2 either in the agreement of May 11, 1974, or at the time of the close of escrow on Lot 1; (6) plaintiffs reserved the right to approve any plans for construction on Lot 1, until close of escrow on Lot 2.
On or about June 1, 1974, apparently in anticipation of obtaining the necessary signatures of American Savings & Loan, defendant Noble wrote to at least three of the tenants in the apartment building advising of the corporation’s intention to convert the building into condominiums, and the details and circumstances attendant to the conversion.
It is undisputed that plaintiffs did all things required of them to conclude the sale and purchase of Lot 1. In accordance with the specific written instructions of Noble, a deed in favor of Noble and Rittenberry, in their individual capacities was executed by plaintiffs, as grantors, and recorded. The sale of Lot 1 was concluded on July 1, 1974, as scheduled. Plaintiffs conveyed the vacant lot without a reservation of an easement. Thereafter, plaintiffs asked defendants to give an easement, but defendants refused.
In considering the defendants’ application for construction on Lot 1, BOZA, on four separate occasions in August, September and October 1974, told defendants that final approval would be conditional upon their giving and recording an easement over the passageway for the benefit of Lot 2. Assured that a suitable easement of ingress and egress would be given, the application was given tentative approval.
*128 It is undisputed that plaintiffs did all things required of them in the second agreement to conclude the sale and purchase of Lot 2. Again, as before, and in strict compliance with the specific written instructions of Noble, plaintiffs executed deeds in favor of Noble and Rittenberiy, in their individual capacities, and delivered the same into escrow in August 1974.
Although it was disputed as to whether any informal extensions were made by the plaintiffs to the defendants after September 1, 1974, regarding the close of escrow on Lot 2, in the latter part of January 1975 defendants were apparently able to get the consent of American Savings & Loan to the conversion of the apartment building. According to Noble, American Savings & Loan, prior to signing the subdivision map, required the plaintiffs to sign a letter. This letter was obtained by Noble and taken to Horowitz for signing. Horowitz secured the plaintiffs’ signatures, and thereafter completed the subdivision in the name of the plaintiffs.[2] The end result of the negotiations was that defendants did not become the owners of Lot 2, but only the owners of Lot 1.
Discussion
1. Did the trial court err in granting and reducing the size of the easement as to the passageway?
Pursuant to stipulation of all counsel, during the course of the trial the trial judge visited the property which is the subject matter of this dispute.[3]
*129 In addition to personally viewing the property, defendant Noble presented a film showing him attempting to get into the garage. After viewing this film, the trial court made the following comment: “[I]n Mr. Noble’s experiment, you’ve still had to cross the property line. . . . [W]hen you made your most successful ventures into the garage, you were coming from right to left. ... I didn’t see one indication there where you didn’t cross ... the property line.”
In its decision the court made the following findings: “Prior to the execution of the two aforesaid Agreements defendants had made a personal inspection of the premises of both Lots and knew of the existence of a paved driveway (hereinafter called ‘Passageway’ and which has been delineated in the Exhibits in evidence) which had been created: (a) as a means of ingress and egress from the basement-garage of Lot # 2; (b) for the benefit of the owners and tenants of Lot #2; (c) so that said owners and tenants could have reasonable and necessary access to and from said basement-garage to a public street. [K] No other reasonable or feasible substitute Passageway is available to the owners or tenants of Lot #2. [K] Lot #2 is the dominant tenement as to any portion of the Passageway that is situated on Lot # 1 and Lot # 1 is the servient tenement of such portion that is situated on Lot # 1.”
The court further concluded that: “Either by necessity and/or as well as by reservation, plaintiff is awarded an easement as to the Passageway described in Paragraph 4 of the Findings of Fact, supra. The size of the easement shall coincide with the general contour of the paved portion now in existence on the servient estate the width of which shall be eight feet from the property line between Lots# 1 and #2.”
*130 Plaintiffs contend that the “trial court erred in reducing size of easement rights reserved to Lot #2 concerning passageway.” More specifically, plaintiffs appear to argue that the trial court erred because (1) defendants breached their agreement to purchase Lot 2; (2) the trial judge, during the course of the trial, and after visiting the scene, made a preliminary statement that the existing blacktop area (which' has a maximum extension of 12 feet) was a bare minimum; (3) the law applicable to implied easements by reservations or easements by necessity, requires awarding an easement identical to that which existed prior to the severance of the tenements; and (4) the evidence presented was sufficient to award an easement to a maximum extension of 12 feet.
Defendants, on the other hand, argue that the granting of any easement to plaintiffs was improper. These contentions lack merit.
Although the trial court found one of the bases for the granting of the easement to plaintiffs to be by necessity, the facts in the case at bar do not support such a legal conclusion. In 3 Miller & Starr, Current Law of California Real Estate (1977) section 18:32, pages 315-316, it is stated: “Under limited circumstances an easement may be implied where it is absolutely essential as access to a dominant tenement. Thus, whenever a landowner sells one of two or more parcels, and the parcel sold is completely landlocked by the remaining property of the grantor, or partly by the land of the grantor and partly by the land of others, in absence of an express intention to the contrary, the law implies that the parties intended to create an easement across the remaining land of the grantor to benefit the property conveyed. . . . [H] An easement is created because of necessity only in very limited circumstances. In order that such easement be implied, the servient and dominant tenants must have been in common ownership at some point in time and, as a result of a conveyance by the common owner, one parcel must become completely landlocked. Once created, an easement by necessity is appurtenant to the dominant tenement.”
In California a right-of-way from necessity cannot exist in the absence of strict necessity.[4] (Pipkin v. Der Torosian (1973) 35 Cal.App.3d 722 [111 *131 Cal.Rptr. 46]; Corea v. Higuera (1908) 153 Cal. 451, 454 [95 P. 882]; Marin County Hospital Dist. v. Cicurel (1957) 154 Cal.App.2d 294 [316 P.2d 32].)
The evidence herein fails to show that Lot 2 is completely landlocked or otherwise inaccessible.
Insofar as the trial court granting an easement to plaintiffs by implied reservation, defendants admit that most of the legal requisites exist for the making of such a finding. However, defendants contend that the original passageway should have been reduced by a minimum of 75 percent rather than the contour of the passageway reduced by a mere four feet.
In Miller & Starr, the authors state; “Under certain circumstances, the law implies that the parties intended to create or transfer an easement by a grant or reservation when there is no written document evidencing their intent and, in some cases, when there is no oral agreement regarding the easement. Thus, implied easements are an exception to the general rule that easements can only be created by an express writing or by prescription. Since implied easements are not favored by the law, the factual circumstances that permit the creation of an implied easement are fairly well established and the implication can only arise where such facts are present.” (3 Miller & Starr, op cit., supra, § 18:21, pp. 297-298.)
In this case where there was no express grant or reservation of an easement, it can only be said to exist by implication, if at all.
Miller & Starr, in discussing the sale of property, asserts the following: “Although a person cannot have an easement on his own property, an owner may use one portion of his land for the use and benefit of another portion. So also, an owner of two adjoining parcels of real properly may make use of one parcel for the benefit of the other. In such cases, for purposes of identification, the portion or parcel that is being used is called the ‘quasi servient tenement.’
“If the owner’s use of the ‘quasi servient tenement’ has continued for a period of time in an obvious and permanent manner, a division of his title implies that the parties intended to transfer the obvious burdens and benefits with the property conveyed. Therefore, if the owner conveys the *132 ‘quasi dominant tenement,’ the grantee receives an implied easement for the use and benefit of his property over the ‘quasi servient tenement’ retained by the owner-grantor.
“The rule has been summarized as follows: \ . . where the owner of two tenements sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the tenement, or portion sold, with all the benefits and burdens which appear, at the time of the sale, to belong to it, as between it and the property which the vendor retains. This is one of the recognized modes by which an easement or servitude is created. No easement exists, so long as there is a unity of ownership, because the owner of the whole may, at any time, rearrange the qualities of the several parts; but the moment a severance occurs, by the sale of a part, the right of the owner to redistribute properties of the respective portions ceases; and easements or servitudes are created, corresponding to the benefits and burdens mutually existing at the time of the sale. This is not a rule for the benefit of purchasers only, but is entirely reciprocal; hence, if, instead of a benefit conferred, a burden has been imposed upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts.’
“For example, if the owner of parcels A and B uses a road over parcel A for ingress and egress from a public highway to a building located on parcel B, a subsequent conveyance of parcel B by an instrument that fails to mention the road, passes an access easement across lot A for the benefit of lot B.
“Since an easement by implication will only arise where there has been an existing use of one parcel or portion of property for the benefit of another, an implied easement is necessarily an appurtenant easement. ...
“The doctrine of implied easements is applied by the courts to cariy into effect the intention of the parties as manifested by the facts and circumstances of the transaction. The grantor’s intentions can be shown by his representations or by representations by his broker that the use of the easement will pass to the grantee. However, the implication only arises where the documents of conveyance fail to mention the easement *133 and where the parties fail to indicate a contrary intention. In other words, a court will not imply the creation of an easement where the parties have expressed contrary intentions.” (3 Miller & Starr, op cit., supra, § 18:23, pp. 300-301, and cases cited therein.)
Civil Code section 1104 provides as follows: “A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed.”
Although the Civil Code speaks only in terms of implying an easement in favor of a grantee, “California also recognizes easements by implied reservation. The result is that a purchaser may take not only the obvious benefits but the obvious burdens as well. (Palvutzian v. Terkanian (1920) 47 C.A. 47, 52 . . .; Rosebrook v. Utz (1941) 45 C.A.2d 726, 729 .. .; see 9 Cal.L.Rev. 465; 1 Cal.L.Rev. 275; 4 So.Cal.L.Rev. 124; 13 So.Cal.L.Rev. 525; Rest., Property § 476; 1943 A.S. 594.) [It] Thus, in Palvutzian v. Terkanian, supra, the owner of land had irrigation ditches on it. He sold that part of the land from which the water came, and the purchaser plowed up the ditches, obstructing the flow. Held, an easement was reserved by the grantor to have the water flow through the ditches to his land.” (3 Witkin, Summary of Cal. Law (1973) Real Property, § 361, p. 2057.)
In light of the above principles of law, the trial court could and did properly find an implied reservation of an easement to the plaintiffs.
Plaintiffs, however, contend that the implied easement should have been as extensive as the prior use. We disagree. The trial court, having heard the testimony and seen the premises, had the right to determine the manner and extent of its use. “[Wjhenever an easement is implied, regardless of how the implication arises, the extent of its use is not necessarily limited to the prior use made of the property by the grantor. The court in each case, examines all of the facts and circumstances surrounding the transaction to give effect to the actual intent of the parties. The prior use of the easement, or the nature of the easement as evidenced by a map or by representations, are persuasive circumstances that usually lead to the conclusion that the prior or represented use is the limit of the future use of the easement. However, such use is *134 not always so limited. In some cases the court measures the future use of the easement by the future utilization and development of the dominant tenement which might reasonably have been expected by the parties.” (3 Miller & Starr, op.cit., supra, § 18:30, p. 314.) See also 3 Witkin, Summary of California Law (1973) Real Property, section 359, page 2056, wherein it is stated: “The implied easement is not confined to the precise use at the time of the transfer; i.e., it may have a broader scope than the quasi-easement on which it is based. The test is the intent of the parties as to the use reasonably contemplated. (Fristoe v. Drapeau (1950) 35 C.2d 5, 9 . . . [holding that C.C. 1104, supra, § 355, must be read together with C.C. 806, defining the extent of servitudes]; Wall v. Rudolph (1961) 198 C.A.2d 684, 692 .. . supra, § 347; Rest., Property § 484, Comment b; see 3 Powell § 416; 25 Am.Jur.2d, Easements and Licenses § 82.)”
As noted in our statement of facts, defendants had prepared plans for construction of a multi-unit dwelling on Lot I at a time when all parties assumed that defendants would ultimately be the owners of both parcels. These plans, which were ultimately approved by the City of San Mateo, provided for an easement on Lot 1 for the benefit of Lot 2, which is identical to that awarded by the court; that is, following the contour of the existing blacktop, but with a maximum extension of 8 feet from the property line, as opposed to the existing 12 feet.
William Churchill, the architect who designed the building to go on Lot 1, indicated that he had considered the need for egress and ingress to Lot 2 and that an easement of 8 feet would meet the city requirement and would be adequate. Therefore, the arguments on appeal, by both plaintiffs and defendants, as to the size and scope of the easement granted, must be construed as an argument against the sufficiency of the evidence. Accordingly, the established principle of appellate review is applicable, to wit: “[I]n examining the sufficiency of the evidence to support a questioned finding, an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is, under the rule which has always prevailed in this court, to be resolved in favor of the finding.” (Bancroft-Whitney Co. v. McHugh (1913) 166 Cal. 140, 142 [134 P. 1157].)
In regard to the question of the size of the easement granted, the record contains substantial evidence supporting the court’s finding that no greater or lesser easement was necessary, required, or implied.
*135 2. Was the retention of the $20,000 by plaintiffs an unenforceable penalty and therefore improper?
Pursuant to the agreement of the parties entered into on May 11, 1974 (cf, fn. 1), the sum of $20,000 was disbursed to plaintiffs. It is agreed that this sum was disbursed in order to grant defendants an extension to September 1, 1974, in order to complete the purchase of Lot 2. In the event the sale of Lot 2 was consummated, then the $20,000 was to be applied to the purchase price. As hereinabove indicated the sale of Lot 2 was never completed. The trial court awarded the $20,000 to plaintiffs.
Defendants contend that the retention of the $20,000 by plaintiffs was in effect a penalty and therefore improper. More specifically, defendants argue that the language in the May 11, 1974, agreement created a liquidated damages provision contrary to Civil Code sections 1670[5] and 1671[6] and is therefore unenforceable.
In its decision the trial court made the following finding: “Because Buyer/Defendant was unable to timely complete the sale and purchase of Lot #2 pursuant to that covering Agreement, at Buyer’s instance, a further and separate Agreement dated May 11, 1974 was entered into between the parties by which, and for a separate consideration in the amount of $20,000.00, Buyer obtained an extension of time to, not later than September 1, 1974, conclude the sale and purchase of Lot #2.”
There is substantial evidence to support the trial court’s finding because the agreement of May 11, 1974, uses the language that the $20,000 is to be “irrevocably disbursed to sellers,” and defendants concede that the instant case does not fit into the classic liquidated damages mold.
*136 Defendants’ reliance on the case of Greenback Bros., Inc. v. Burns (1966) 245 Cal.App.2d 767 [54 Cal.Rptr. 143], is misplaced. In the Greenback case, Bums put up $50,000 to purchase the Olympic Hotel in San Francisco on a total purchase price of $1,360,000. The $50,000 was paid into escrow and the contract provided for retention of the $50,000 by sellers as liquidated damages in the event of Bums’ default. Bums needed more time to come up with the financing and by addendum, close of escrow was extended 15 days. However, Bums, by the addendum was required to put up an additional $25,000 in escrow, with the $25,000 also to be added to the $50,000 as liquidated damages. The appellate court affirmed the order of the trial court finding that the payment of the entire $75,000 to plaintiff, for defendants’ breach was an unenforceable penalty. Defendants here, however, fail to point out that the agreement in Greenback specifically provided for liquidated damages but was unenforceable under Civil Code section 1671.
The parties who entered into the agreement in question herein were sophisticated investors and developers and we can assume they intended the ordinary and common meaning of the words used. Furthermore, the language used in the May 11, 1974, agreement was unequivocal and explicitly stated that the $20,000 was to be “irrevocably disbursed,” and there is nothing to indicate in the agreement or in the escrow instructions that plaintiffs or defendants contemplated a default, forfeiture, penalty or any breach of any obligation or that they were even considering liquidated damages. In other words, there was no contingency whatsoever attached to the payment of the $20,000. This payment was simply the consideration paid for defendants’ right to extend the date of performance under the original agreement. In no event can the language of said agreement be constmed as a claim for damages for the possible breach of the agreement, and it cannot be argued that when money is “irrevocably disbursed” it constitutes a void penalty provision under the terms of Civil Code sections 1670 and 1671. (Blank v. Borden (1974) 11 Cal.3d 963 [115 Cal.Rptr. 31, 524 P.2d 127].)
3. Did the trial court err in finding defendants breached their agreement to purchase Lot 2?
The trial court found that defendants failed to perform the conditions of the agreements so as to conclude the sale and purchase of Lot 2 and specifically found defendants had been in default of and had breached the agreements of February 10, 1974, and of May 11, 1974.
*137 The sales agreement of February 10, 1974, provided that the sale as to Lot 2 was subject to the following condition: “Approval of existing building as a condominium by the San Mateo City bureau of planning and adjustments and the San Mateo City council, if necessary.”
Defendants contend the condition was a condition precedent that never occurred and therefore any finding of default and/or breach by defendants is error. This contention lacks merit.
The evidence in this case amply reflects that defendants’ application to convert the Casa Hermosa apartments located on Lot 2 to a condominium was approved on April 9, 1974, and defendants were so notified by both the Director of Public Works and the City Planner of the City of San Mateo.
The above-referred to evidence should be and is dispositive of the issue of whether or not the language in the agreement of February 10, 1974, created a condition precedent which in any way legally excused defendants’ performance under the contract.
4. Did the trial court err in denying defendant Noble’s motion for new trial?
Defendant Noble’s motion for new trial was based upon the discovery on or about August 2, 1976, that a portion of Lot 1 was burdened with an easement, 10 or more feet in width, through which runs a buried gas pipeline. The easement, which was conveyed to PG&E in 1928 and 1929, was discovered when Noble had a new title search run on the lot.
Defendant Noble contends that “the trial court’s denial of defendant’s motion for new trial was without reasonable basis and therefore should be reversed.” This contention lacks merit. “One of the statutory grounds for a new trial is: ‘Newly discovered evidence, material for the party making the application, which he could not, with reasonable diligence have discovered and produced at the trial.’ (Code Civ. Proc., § 657, subd. 4.) The essential elements which must be established are (1) that the evidence is newly discovered; (2) that reasonable diligence has been exercised in its discovery and production; and (3) that the evidence is material to the movant’s case. While the granting of a new trial on the ground of newly discovered evidence is ordinarily a matter which is committed to the sound discretion of the trial court, where the evidence adduced in support of the motion is lacking in essential particulars, there *138 is no basis for the exercise of discretion. (Slemons v. Paterson, 14 Cal.2d 612, 615-616 . . .; Bostard v. Bostard, 258 Cal.App.2d 793, 799-800 . . .; Lubeck v. Lopes, 254 Cal.App.2d 63, 67 . . .; De Felice v. Tabor, 149 Cal.App.2d 273, 275-276 . . . .)” (Schultz v. Mathias (1970) 3 Cal.App.3d 904, 909-910 [83 Cal.Rptr. 888]; see also Cansdale v. Board of Administration (1976) 59 Cal.App.3d 656 [130 Cal.Rptr. 880].)
It has also been stated that: “The decision on a motion for a new trial rests largely in the sound discretion of the trial court, but the rule is more applicable to a motion made on the ground of newly discovered evidence. Ordinarily newly discovered evidence is looked upon with suspicion and disfavor. (Estate of Cover, 188 Cal. 133, 139 . . .; Arnold v. Skaggs, 35 Cal. 684; Hicks s. Ocean Shore Railroad, Inc., 18 Cal.2d 773, 789 . . . .) The trial court’s determination ‘will not be disturbed unless an abuse of discretion is clearly shown.’ (Maloof v. Maloof 175 Cal. 571, 574 ...; Stanley s. Columbia Broadcasting System, Inc., 35 Cal.2d 653, 668 ...; People v. Williams, 57 Cal.2d 263, 270 . . . .)” (Kyle v. Stone (1965) 234 Cal.App.2d 286, 293 [44 Cal.Rptr. 390].)
Assuming the evidence referred to by defendant was newly discovered and he could not have discovered and produced it at trial with reasonable diligence, there must still be a showing that such evidence also is material in the sense that it is likely to produce a different result. (Schultz v. Mathias, supra, 3 Cal.App.3d at p. 910; Waer v. Waer (1922) 189 Cal. 178 [207 P. 891]; Carpenter v. Kilgour (1965) 236 Cal.App.2d 651, 658 [46 Cal.Rptr. 115].) After having heard defendant’s motion for a new trial, the trial court stated: “Also the Court would have to find that even if these things were disclosed during the course of the trial, that they would not have changed the result of the trial. The Court’s decision would have been the same.”
We therefore find that the trial court applied the proper test in denying defendant’s motion for a new trial and did not abuse its discretion.
Plaintiffs’ attempt to raise several other issues in support of their appeal, such as failure of the trial court to grant them injunctive relief against defendants’ building on Lot 1 until close of escrow on Lot 2, and the failure of the trial court to render findings of fact and conclusions of law necessary to support certain portions of the judgment.
Plaintiffs, however, have failed to furnish this court with any citation of authorities to support their position in this regard. In 6 Witkin, *139 California Procedure (2d ed. 1971) Appeal, section 425, page 4391, it is stated: “The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel. Accordingly every brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. (See Utz v. Aureguy (1952) 109 C.A.2d 803, 807 . . .; Woodcock v. Petrol Corp. (1941) 48 C.A.2d 652, 657 . . .; Estate of Hunt (1939) 33 C.A.2d 358, 361 . . .; People v. Paramount Citrus Assn. (1957) 147 C.A.2d 399, 407 . . . citing the text; Wilson v. Board of Retirement (1957) 156 C.A.2d 195, 212 . . . citing the text; Greenstone v. Claretian Theo. Seminary (1959) 173 C.A.2d 21, 35 . ..; Sutter v. Gamel (1962) 210 C.A.2d 529, 531 ... citing the text; Coronet Credit Corp. v. West Thrift Co. (1966) 244 C.A.2d 631, 642 . . . citing the text.)”
Based on the above authorities, we treat the above allegations of error as being waived.
As to plaintiffs’ and defendants’ other contentions of alleged error, we find each of them to be without merit.
Accordingly, the judgment of the court below is affirmed, and each party is to bear its own costs on appeal.
Racanelli, P. J., and Elkington, J., concurred.

 Assigned by the Chairperson of the Judicial Council.

The May 11, 1974, agreement reads in part as follows: “This is to confirm our verbal agreement this date regarding the two transactions on subject properties: “Buyer requires a 30 to 60- day extension of time beyond the July 2, 1974, close of escrow for the transaction on Lot #2. “Seller hereby grants said extension until not later than Sept. 1, 1974, with the following consideration:
“LOT 2 - “(1) - The $10,000.00 deposit now in escrow will be irrevocably disbursed to sellers
forthwith. “(2) - An additional $10,000.00 will be irrevocably disbursed to sellers not later than *127 May 24, 1974. “(3) - Referring to prepayment penalty to American Savings and Loan Assoc., Buyer will reimburse Seller for 20% of the penalty; however, sum not to exceed One Thousand Seven Hundred Seventy-Five and No/100—($1,775.00).
“LOT 1 - “(1) - Close of escrow will be as scheduled on July 1, 1974. “(2) - Plans for construction of any kind on Lot 1 shall be subject to approval by Seller until close of escrow on Lot 2.”

It should be noted that in the meantime, in January 1975, plaintiffs entered into an agreement with a new buyer, Joseph Karp, for the sale of Lot 2 for an amount $25,000 greater than defendants had offered. Buyers’ offer was subject to the curing of certain conditions. Defendants knew of and encouraged the consummation of this proposed sale. This deal was subsequently cancelled by Karp.

The following day the judge made the following observations: “Last night I went out and looked at the driveway pursuant to stipulation of both counsel. Although I was in my car, I even got out and wandered around a little bit in the rain just to see it. I also tried to try driving out of the two driveways. There’s [sic] two doors and one door, the door furthest away—I don’t know who constructed it,, but it’s very narrow. I pulled my car in and backed it around and so forth. ... I had no doubt, no question in my mind after I started to jockey my car around, that it is necessary. By way of reference to cars yesterday, I drove a little Capri and I had difficulty with the Capri trying to stay within the line. If I took my Mercury station wagon, I’d never make it. So that would be one of the findings of the Court at this point.. . . [F]rom the observation of the Court and from utilizing it, the blacktop area, the paved portion is a bare minimum to be able to use the garages.
“Now, you may be able to convince me that the tenants never use the garage, but what *129 effect does this have on the dominant estate if somebody does not have access to the garage? In fact, another reaction I had, Mr. Gwire, if I lived in that apartment unit or wherever it is now and if I was cut off, in fact, I noticed that there’s a proposed building site there where there would be a wall. . . . Yeah, that is difficult to get into and I commented that I thought whoever put that thing there originally sure didn’t leave much leeway, I already wiped out a comer going in slowly myself and that is even needed, you need the space there to maneuver in and out of that garage which is the easier one to get out of....
“Let me give another observation that I made. ... I considered the need for the car, the overhang of the car . . ., but the paved portion would allow this to happen because what I was guided by was the green mark placed there as the property line and I considered the overhang necessary to turn around. It’s conceivable that you could keep your wheels maybe on this side of the green line with some difficulty, but there would be other parts of the car that would be hanging over so when I tried to give you an idea of reaction of the Court, for instance, if the paved portion had a brick wall around it, you would still be able to turn your car, that would be mine.”

As was said in the very early California case of Kripp v. Curtis (1886) 71 Cal. 62, 65 [11 P. 879], and consistently followed since that date: “The right of way from necessity must be in fact what the term naturally imports, and cannot exist except in cases of strict necessity. It will not exist where a man can get to his property through his own land. That the way over his own land is too steep or too narrow, or that other and like difficulties exist, does not alter the case, and it is only where there is no way through his own land *131 that a grantee can claim a right over that of his grantor. It must also appear that the grantee has no other way. [Citation.]”

Civil Code section 1670 provided: “Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section.” (Repealed by Stats. 1977, ch. 198, § 2, operative July 1, 1978.)

Civil Code section 1671 provided; “The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.” (Amended by Stats. 1977, ch. 198, § 4, operative July 1, 1978.)